FILED
Clay Co. Circuit Court
4th Judicial Circuit
Date: 5/8/2020 3:57 PM
Crystal Ballard

**IN THE CIRCUIT COURT
FOR THE FOURTH JUDICIAL CIRCUIT
CLAY COUNTY, ILLINOIS**

| | |
|---|---|
| Sonja Harrison dba Visible Changes )<br>)<br>) | |
| Plaintiff, ) | **2020CH8** |
| ) | |
| vs. ) | Case No. 2020-CH-_____ |
| ) | |
| Governor Jay Robert Pritzker, )<br>in his official capacity, ) | |
| ) | |
| Defendant. ) | |

**VERIFIED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF
AGAINST GOVERNOR JAY ROBERT PRITZKER**

COMES NOW Plaintiff, Sonja Harrison dba Visible Changes (hereinafter referred to as

"Sonja") by and through her attorneys, Thomas G. DeVore, Erik Hyam, and DeVore Law Offices,

LLC, and for her Verified Complaint for Declaratory Judgment and Injunctive Relief against

Defendant, Governor Jay Robert Pritzker (hereinafter referred to as "Pritzker"), in his official

capacity, and hereby alleges as follows:

1.  On April 30, 2020, Pritzker entered his third sequential disaster proclamation regarding

    COVID-19 (hereinafter "Proclamation #3"). (See attached Exhibit 1.)

2.  Pritzker issued Proclamation #3 under the authority granted him under the Illinois

    Emergency Management Agency Act. (See also 20 ILCS 3305 *et seq.* which is hereinafter

    referred to as the "IEMAA.") (See Exhibit 2.)

3.  The IEMAA states: "In the event of a disaster, as defined in Section 4, the Governor may, by

    proclamation, declare that a disaster exists." (See Section 4 of the IEMAA.)

4. Pritzker proclaimed the COVID-19 virus constituted a disaster as defined under the Act on April 30, 2020.

5. As a result of Proclamation #3, Pritzker issued Executive Order 2020-32 (hereinafter "EO 32"). (See Exhibit 3.)

6. Sonja is the owner of a hair salon business located in Clay County, IL.

7. Sonja has earned her a living as a hair stylist for 35 years.

8. Unfortunately, Sonja has had her business ordered closed by Pritzker, due to an arbitrary determination her business is "non-essential." (See Section 2-2 and 12a-12w of EO 32.)

9. While most recently EO 32 closed her business from May 01 to May 30, she has been closed due to similar executive orders of Pritzker since on or about March 20, 2020.

10. At no time relevant, did Sonja get notice from Pritzker her business was being forcibly closed.

11. At no time relevant, did Sonja receive notice from Pritzker of any due process rights being afforded to her.

12. At no time relevant, has Sonja ever been contacted by the Department of Health wherein it sought to close her business due to any alleged health risks.

13. Upon information and belief, Pritzker must have presumed Sonja heard about EO 32 which stripped her fundamental liberties on one of his daily press briefings if she happened to be watching that day, or maybe she might have heard it from one of her friends in passing.

14. As alleged authority to order Sonja's closure, Pritzker relies on two authorities:
    a) Powers vested in him as the Governor of the State of Illinois; and
    b) Sections 7(1), 7(2), 7(3), 7(8), 7(9) and 7(12) of the IEMAA.
    (See the "THEREFORE" clause on page 2 of EO 32)

15. Pritzker further states the powers utilized to mandate Sonja's closure were consistent with public health laws. (See the "THEREFORE" clause on page 2 of EO 32)

16. EO 32 further states the authority wielded by Pritzker therein was not to alter or modify the authority of any state, county, or local government authority.  (See Section 19 of EO 32)

17. According to Pritzker, the EO is enforceable only by State and Local Law enforcement pursuant to, *inter alia*, Section 7, Section 15, Section 18, and Section 19 of The IEMAA. (See Section 17 of EO 32)

18. As such our police officers from the state to municipal level have been ordered by Pritzker to seize and restrain Sonja, and our citizens in general, for exercising their fundamental liberties which are guaranteed by the U.S. and Illinois Constitutions,  all the while denying the same of due process.

19. It bears mentioning to the Court that none of those four sections of the IEMAA for which Pritzker relies to infringe on liberties have anything to do with enforcement.

20. Upon information and belief, the public health laws which Pritzker states are consistent with his authority to close Sonja's business in EO 32 is assuredly the Illinois Department of Public Health Act, being 20 ILCS 2305 *et seq.* (hereinafter referred to as "IDPHA"). (See the "THEREFORE" clause on page 2 of EO 32) (IDPHA is attached hereto as Exhibit 4)

21. IDPHA has general supervision of the interests of the health and lives of the people of the State.  (See 20 ILCS 2305/2(a))

22. It has **supreme** authority on these matters.  *Id.* (Emphasis Added)

23. Subject to the provisions of subsection (c), **the Department** may order a place to be closed and made off limits to the public to prevent the probable spread of a dangerously contagious or infectious disease until such time as the condition can be corrected or the danger to the

public health eliminated or reduced in such a manner that no substantial danger to the public's health any longer exists. (See 20 ILCS 2305/2(b).)

24. Except as provided in this Section, no place may be ordered to be closed and made off limits to the public except with the consent of the person or owner of the place or upon the prior order of a court of competent jurisdiction.  (See 20 ILCS 2305/2(c).)

25. The Department may, however, order a place to be closed and made off limits to the public on an immediate basis without prior consent or court order if, in the reasonable judgment of the Department, immediate action is required to protect the public from a dangerously contagious or infectious disease.  *Id.*

26. In the event of an immediate order issued without prior consent or court order, the Department shall, as soon as practical, within 48 hours after issuing the order, obtain the consent of the person or owner or file a petition requesting a court order authorizing the closure. *Id.*

27. To obtain a court order, the Department, by clear and convincing evidence, must prove that the public's health and welfare are significantly endangered as the business is a place where there is a significant amount of activity likely to spread a dangerously contagious or infectious disease.  *Id.*

28. The Department must also prove that all other reasonable means of correcting the problem have been exhausted and no less restrictive alternative exists. *Id.*

29. Businesses that are ordered to be closed and made off limits to the public, shall be given a written notice of such order. The written notice shall additionally include the following: (1) notice of the right to counsel; (2) notice that if the person or owner is indigent, the court will appoint counsel for that business owner; (3) notice of the reason for the order for closure; (4)

notice of whether the order is an immediate order, and if so, the time frame for the

Department to seek consent or to file a petition requesting a court order as set out in this

subsection; and (5) notice of the anticipated duration of the closure. *Id.*

30. The notice which is required by the IDPHA before a business can be closed is attached

    herein. (See attached Exhibit 5)

31. All of these procedures and standards of the IDPHA required to close a business have been

    reduced to administrative rules as promulgated in the Administrative Code. (hereinafter

    referred to as "The Code") (See attached Exhibit 6)

32. Notwithstanding the enforcement provision in EO 32 expressly limits the authority of

    enforcement to state and local law enforcement, pursuant to four hollow provisions of the

    IEMAA. (See Section 17 of EO 32)

33. Sonja was scared to even file this cause of action to defend herself in this Honorable Court as

    Pritzker has been on television threating to take the business licenses of citizens should they

    not yield to his authority.

34. Her fear has been even more solidified as she has seen documents on social media from other

    Illinois state administrative agencies under Pritzker's control threatening fellow business

    owner's licenses for peacefully disobeying EO 32.

## COUNT I
## DECLARATORY JUDGMENT
## PRITZKER HAS NO AUHORITY TO ORDER THE
## CLOSER OF SONJA'S BUSINESS UNDER THE
## CONSTITUTION OR THE ACT

35. Plaintiff restates paragraphs 1-34 as if more fully stated herein.

36. In relation to the specific matters raised herein, in order to close Sonja's business, Pritzker must have acted under the constitutional powers vested in him as Governor, or under the powers delegated to him under The IEMAA by the legislative branch.

37. Nowhere in EO 32 does Pritzker identify what Constitutional power is vested in him to seize control of Sonja's business and order it closed.

38. His suggestion of having constitutional authority is nothing but conclusory.

39. As Governor, he is the supreme executive of the State of Illinois.

40. In that role, he is charged with the faithful execution of the laws of the State and not the making of laws.

41. Seizing control of Sonja's business and ordering it closed was a clear utilization of the police powers of the State.

42. Police powers are vested in the sound discretion of the legislative branch of government.

43. As such, Pritzker must find authority to forcibly close Sonja's business under the cited sections of the IEMAA, power which would have been delegated to him by the legislative branch, and if he has none, the order of closure of Sonja's business would be unlawful and void.

44. Even under the most strained interpretation of Pritzker's cited sections 7(1), 7(2), 7(3), 7(8), 7(9) and 7(12) of The IEMAA, nowhere can it be found where the legislative branch expressly delegated any power to Pritzker to forcibly close private businesses such as Sonja's, let alone without offering any shred of due process of law.

45. Pritzker made it clear EO 32 was not intended to alter or modify any existing State, County or local authority over business closures. (See Section 19 of EO 32)

46. Sonja does not dispute in times such as these, and at all times for that matter, the Department of Health has the authority to forcibly close her business if it is deemed to be a public health risk.

47. The legislative branch, in its sound discretion, placed the supreme authority over closure of businesses due to public health risks within the Department of Health pursuant to the IDPHA.

48. While Pritzker may desperately attempt to glean some semblance of a shred of delegated authority under his cited sections of EO 32 to close Sonja's business, nothing should remotely compel this Court his strained and desperate interpretation might in anyway supersede the express supreme authority vested in the Department of Health by the people's lawmaking branch of our government.

49. Moreover, any interpretation of the statute which would interfere with a fundamental right would be unconstitutional for failure to provide due process.

50. The supreme authority over matters of closure of businesses due to health risks is quite compelling language the legislature used when granting the Department of Health this extraordinary power over Sonja's fundamental liberties.

51. Even though in other executive orders, Pritzker has unlawfully suspend sections of legislative statutes, he has never attempted to suspend the legislative grant of supreme authority made to the Department of Health regarding business closures.

52. The IDPHA contains significant constitutional procedural and substantive due process rights, which rights include the right to counsel, and if one cannot afford counsel, counsel will be appointed.

53. Pritzker in EO 32 states his actions therein were consistent with public health laws.

54. It is unimaginable how Pritzker can proclaim Sonja's business must close due to arbitrarily having been deemed a health risk with no articulable facts, having further been arbitrarily determined to be non-essential, her doors forcibly closed with absolutely no due process right ever being afforded, all of which was thrust upon her under the mighty hand and authority of the executive office of this state.

55. That abuse of executive power is in no way consistent with the significant procedural and substantive due process rights Sonja is expressly afforded under the supreme authority of this state granted by the legislative branch to the IDPHA in regard to the closure of businesses when it might become necessary in the interest of public health.

56. Sonja had an absolute right, if her business was to be forcibly closed against her will, that it be done within the confines of the statutory scheme unequivocally delegated by the people's representatives to the Department of Health, and she be afforded the procedural and substantive due process which the IDPHA provides.

57. An actual controversy exists between the parties in regard to the authority of Pritzker to issue and enforce that part of EO 32 which shuttered Sonja's business against her will and without due process.

58. An immediate and definitive determination is necessary to clarify the rights and interests of the parties.

WHEREFORE, Plaintiff, Sonja Harrison, herein requests that this court enter an Order:

A.     Entering an order finding Pritzker issued EO 32 on April 30, 2020;

B.     Entering an order finding EO 32 ordered Sonja Harrison' business closed with no due process afforded her;

C.     Enter an order declaring Pritzker had no constitutional right to forcible close Sonja
        Harrison's business without due process;

D.     Entering an order declaring that none of the cited provisions of the IEMAA in EO
        32 delegated Pritzker any authority order the closure of Sonja Harrison's business;

E.     Finding that any provisions of the IEMAA which might be construed to allow for
        the forceable closure of Sonja's business would render that provision
        unconstitutional for interfering with a fundamental right without due processs;

F.     Enter an order declaring the proper mechanism for closure of Sonja Harrison's
        business due to any public health risks has been expressly delegated to the
        Department of Health under the Illinois Department of Public Health Act;

G.     Enter an order declaring EO 32 is void to the extent it forcible closed Sonja
        Harrison's business;

H.     Awarding Sonja Harrison her costs incurred in this matter as may be allowed by
        law;

I.     That the Court grant such other and further relief as is just and proper.

## COUNT II
## REQUEST FOR INJUNCTION

59. Plaintiff restates paragraphs 1-58 as if more fully stated herein.

60. Sonja has a right to insist EO 32, to the extent it attempts to forcibly close her business,
strictly comport to any constitutional or statutory authority residing with Pritzker.

61. Sonja is being irreparably harmed each and every day in which she continues to be unable to
engage in her business in that she continues to lose income from employment and at the same
time continues to incur the expenses of keeping her business open such as insurance, utilities
and the like.

62. Sonja has no adequate remedy at law to prohibit Pritzker from enforcing EO 32 against her absent an injunction from This Court ordering the same.

63. There is a reasonable likelihood of success on the merits for the following reasons:

   a) Pritzker has no constitutional authority to forcible close Sonja's business;

   b) Pritzker has no authority under the IEMAA to forcible close Sonja's business;

   c) IDPHA is the supreme authority in the matters of business closure and at no time did this administrative agency seek an order of closure of Sonja's business due to any health risk.

WHEREFORE, Plaintiff, Sonja Harrison, prays that this Court enter judgment in his favor and finds and declares that:

   A.  Finding the Sonja Harrison has a right to insist Pritzker's EO 32 forcibly closing her business was supported by constitutional or statutory authority.

   B.  Finding Sonja Harrison is irreparably harmed each day she is not allowed to use have her business open to earn a living and pay her expenses.

   C.  Finding Sonja Harrison has no adequate remedy at law to protect her rights against this unlawful order of Pritzker beyond injunctive relief.

   D.  Finding Sonja Harrison has a likelihood of success on the merits as Pritzker forcibly closed her business without any grant of legal authority.

   E.  Enter an injunction permanently enjoining EO 32, or any substantively similar executive order issued by Pritzker, from being legally enforced directly by Pritzker, or indirectly by any licensing agency under his control, demanding Sonja Harrison forcibly close her business.

   F.  For such other relief as this Court deems just and proper.

Respectfully submitted,

By:    /s/ Thomas Devore
       Thomas G. DeVore
       IL Bar Reg. No. 6305737
       **DeVore Law Offices, LLC**
       Attorneys for Plaintiff
       118 N. 2nd St.
       Greenville, IL 62246
       Telephone - 618-664-9439
       tom@silverlakelaw.com

       /s/ Erik Hyam
       Erik Hyam
       IL Bar No. 6311090
       **DeVore Law Offices, LLC**
       Attorneys for Plaintiff
       118 N. Second Street
       Greenville, IL  62246
       Tel.  (618) 664.9439
       Fax  (618) 664.9486
       erik@silverlakelaw.com

## VERIFICATION

Under penalties of perjury as provided by law pursuant to Section 1-109 of the Code of Civil

Procedure, the undersigned certifies that the statements set forth in this instrument are true and

correct except as to matters therein stated to be on information and belief, if any, and as to such

matters the undersigned certifies as aforesaid that the undersigned verily believes the same to be

true.

Date: _May 8_, 2020            By _Sonja Harrison_

Sonja Harrison



# Gubernatorial Disaster Proclamation

**WHEREAS,** protecting the health and safety of Illinoisans is among the most important functions of State government; and,

**WHEREAS,** it is critical that Illinoisans who become sick are able to be treated by medical professionals, including when a hospital bed, emergency room bed, or ventilator is needed; and,

**WHEREAS,** it is also critical that the State's health care and first responder workforce has adequate personal protective equipment (PPE) to safely treat patients, respond to public health disasters, and prevent the spread of communicable diseases; and,

**WHEREAS,** Coronavirus Disease 2019 (COVID-19) is a novel severe acute respiratory illness that has spread among people through respiratory transmissions, the World Health Organization declared COVID-19 a Public Health Emergency of International Concern on January 30, 2020, and the United States Secretary of Health and Human Services declared that COVID-19 presents a public health emergency on January 27, 2020; and,

**WHEREAS,** on March 11, 2020, the World Health Organization characterized the COVID-19 outbreak as a pandemic, and has reported more than 3 million confirmed cases of COVID-19 and 200,000 deaths attributable to COVID-19 globally as of April 30, 2020; and,

**WHEREAS,** a vaccine or treatment is not currently available for COVID-19 and, on April 24, 2020, the World Health Organization warned that there is currently no evidence that people who have recovered from COVID-19 and have antibodies are protected from a second infection; and,

**WHEREAS,** despite efforts to contain COVID-19, the World Health Organization and the federal Centers for Disease Control and Prevention (CDC) indicated that the virus was expected to continue spreading and it has, in fact, continued to spread rapidly, resulting in the need for federal and State governments to take significant steps; and,

**WHEREAS,** on March 9, 2020, I, JB Pritzker, Governor of Illinois, declared all counties in the State of Illinois as a disaster area in response to the outbreak of COVID-19 (First Gubernatorial Disaster Proclamation); and,

**WHEREAS,** on March 13, 2020, the President declared a nationwide emergency pursuant to Section 501(b) of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121-5207 (the "Stafford Act"), covering all states and territories, including Illinois; and,

**WHEREAS,** on March 26, 2020, the President declared a major disaster in Illinois pursuant to Section 401 of the Stafford Act; and,

**WHEREAS,** on April 1, 2020, due to the exponential spread of COVID-19 in Illinois, I again declared all counties in the State of Illinois as a disaster area (Second Gubernatorial Disaster Proclamation); and,



WHEREAS, as circumstances surrounding COVID-19 rapidly evolve, there have been frequent changes in information and guidance from public health officials as a result of emerging evidence; and,

WHEREAS, from the outset, data suggested that older adults and those with serious underlying health conditions are more likely to experience severe and sometimes fatal complications from COVID-19; and,

WHEREAS, emerging evidence has shown that young people, including infants and toddlers, are also at risk for such complications; and,

WHEREAS, as of March 16, 2020, an analysis by the CDC showed that 38 percent of hospitalized COVID-19 patients were between the ages of 20 and 54, and there is evidence that COVID-19 causes blood clots and strokes, and has caused deadly strokes in young and middle-aged patients who exhibited few symptoms; and,

WHEREAS, the understanding on spread from infected individuals who have not shown symptoms has changed and, on April 12, 2020, the CDC changed the period of exposure risk from "onset of symptoms" to "48 hours before symptom onset"; and,

WHEREAS, previously, the CDC recommended against wearing cloth face coverings or masks as protection and, now, in light of new research on asymptomatic and pre-symptomatic transmission, the CDC now recommends wearing cloth face coverings in public settings where social distancing measures are difficult to maintain; and,

WHEREAS, as COVID-19 has spread in Illinois over the course of the Gubernatorial Disaster Proclamations, the circumstances causing a disaster throughout the State have changed; and,

WHEREAS, at the time I issued the First Gubernatorial Disaster Proclamation, there were 11 confirmed cases of COVID-19 in one Illinois county; and,

WHEREAS, as of today, April 30, 2020, there have been nearly 53,000 confirmed cases of COVID-19 in 97 Illinois counties; and,

WHEREAS, the first death attributed to COVID-19 in Illinois was announced on March 17, 2020; and,

WHEREAS, as of April 30, 2020, Illinois has had more than 2,350 deaths resulting from COVID-19, including 141 deaths reported over a 24-hour period on April 30; and,

WHEREAS, studies suggest that for every confirmed case there are many more unknown cases, some of which are asymptomatic individuals, meaning that individuals can pass the virus to others without knowing; and,

WHEREAS, the Illinois Department of Public Health activated its Illinois Emergency Operations Plan and its Emergency Support Function 8 Plan to coordinate emergency response efforts by hospitals, local health departments, and emergency management systems in order to avoid a surge hospital resources and capacity; and,

WHEREAS, as the virus has progressed through Illinois, the crisis facing the State has developed and now requires an evolving response to ensure hospitals, health care professionals and first responders are able to meet the health care needs of all Illinoisans and in a manner consistent with CDC guidance that continues to be updated; and,

WHEREAS, in order to ensure that health care professionals, first responders, hospitals and other facilities are able to meet the health care needs of all residents of Illinois, the State must have critical supplies, including PPE, such as masks, face shields, gowns, and gloves; and,

WHEREAS, the State of Illinois maintains a stockpile that supports the existing PPE supply chains and stocks at various healthcare facilities; and,

WHEREAS, across the State, hospitals and long-term care facilities use approximately 1.5 million N95 masks, 25 million gloves, 4.4 million gowns, and 700,000 surgical masks during a 10-day period; and,

WHEREAS, the State had distributed among all 102 Illinois counties millions of surgical masks and N95 masks, tens of thousands of gowns, millions of pairs of gloves, and hundreds of thousands of face shields from the State stockpile; and,

WHEREAS, the Illinois Department of Public Health has provided guidance to all hospitals and EMS providers recommending the immediate elevation of their conservation and contingency strategies as it relates to PPE; and,

WHEREAS, while the State is making every effort to procure additional PPE, if those procurement efforts are disrupted or Illinois experiences a surge in COVID-19 cases, the State faces a life-threatening shortage of respirators, masks, protective eyewear, face shields, gloves, gowns, and other protective equipment for health care workers and first responders; and,

WHEREAS, Illinois is using a high percentage of hospital beds, ICU beds, and ventilators as a result of the number of COVID-19 patients that require hospitalization and, if cases were to surge higher, the State would face a shortage of these critical health care resources; and,

WHEREAS, Illinois currently has a total of 32,010 hospital beds with 3,631 ICU beds, of which, as of April 30, 2020, only 33% of hospital beds and 25% of ICU beds were available statewide, and only 17% of ICU beds were available in the Chicago region; and,

WHEREAS, the State worked with top researchers from the University of Illinois at Urbana-Champaign, the Northwestern School of Medicine, the University of Chicago, the Chicago and Illinois Departments of Public Health, along with McKinsey and Mier Consulting Group, and Civis Analytics, to analyze two months' worth of daily data on COVID-19 deaths and ICU usage and model potential outcomes; and,

WHEREAS, the State's modeling shows that its health care resource utilization will not peak until May, and that health care resources will continue to be limited after the peak; and,

WHEREAS, the State's modeling shows that without extensive social distancing and other precautions, the State will not have sufficient hospital beds, ICU beds or ventilators; and,

WHEREAS, Illinois currently has a total of 32,010 hospital beds, and the State's modeling shows that without a "stay at home" order, more than 100,000 hospital beds would be necessary; and,

WHEREAS, Illinois currently has a total of 3,631 ICU beds, and the State's modeling shows that without a "stay at home" order, more than 25,000 ICU beds would be necessary; and,

WHEREAS, Illinois currently has a total of 3,378 ventilators, and the State's modeling shows that without a "stay at home" order, upwards of 20,000 ventilators would be necessary; and,

WHEREAS, the State's modeling shows that without a "stay at home" order, the number of deaths from COVID-19 would be between 10 to 20 times higher than with a "stay at home" order in place; and,

WHEREAS, the epidemiology concept of $R_0$ (R-naught) – which represents the number of cases, on average, an infected person will cause during their infectious period – is an important measure of progress in combatting a virus like COVID-19, and that an Ro of below 1 is a critical milestone because it suggests that the disease is declining rather than spreading; and,

WHEREAS, the State's estimated effective $R_0$ was approximately 3.5 at the beginning of the outbreak, but the number has improved to approximately 1.25 based on the State's emergency measures, including the "stay at home" order; and,

WHEREAS, hospital beds, ICU beds, and ventilators are needed not for just patients with COVID-19, but also for any number of additional illnesses and injuries; and,

WHEREAS, fewer Illinoisans have sought non-COVID-19 related medical care and emergency care in recent weeks and it is critical that Illinoisans are able to and willing to seek non-COVID-19 related medical care and emergency care; and,

WHEREAS, Illinoisans will be able to and willing to seek non-COVID-19 related medical care and emergency care if there are sufficient hospital beds, ventilators, and if medical personnel are able to protect themselves with PPE; and,

WHEREAS, the State has been limited in the number of COVID-19 tests that can be taken and processed due to a limited number of testing sites and labs, as well as a shortage of necessary supplies, including the swabs needed to take samples; and,

WHEREAS, at the time I issued the First Gubernatorial Disaster Proclamation, Illinois had capacity to test no more than a few hundred people per day for COVID-19 at a small number of testing sites; and,

WHEREAS, the State has developed testing sites throughout the State and now has increased the COVID-19 tests per day to more than 10,000; and,

WHEREAS, as of April 30, 2020, Illinois has tested nearly 270,000 total specimens for COVID-19; and,

WHEREAS, national projections adjusted for Illinois' population suggest the state may need to process several thousand more tests per day as part of the effort to permanently slow and reduce the spread of COVID-19; and,

WHEREAS, the World Health Organization has identified a positive test rate of 10% as a benchmark for adequate testing but currently over 20% of the COVID-19 tests administered in Illinois have positive results, suggesting that Illinois must continue increasing testing; and,

WHEREAS, based on the foregoing facts, and considering the expected continuing spread of COVID-19 and the resulting health impacts that will be felt over the coming month by people across the State, the current circumstances in Illinois surrounding the spread of COVID-19 constitute an epidemic emergency and a public health emergency under Section 4 of the Illinois Emergency Management Agency Act; and,

WHEREAS, based on the foregoing, the new circumstances surrounding the threatened shortages of hospital beds, ICU beds, ventilators, and PPE, and critical need for increased COVID-19 testing capacity constitute a public health emergency under Section 4 of the Illinois Emergency Management Agency Act; and,

WHEREAS, it is the policy of the State of Illinois that the State will be prepared to address any disasters and, therefore, it is necessary and appropriate to make additional State resources available to ensure that that our healthcare delivery system is capable of serving those who are sick and that Illinoisans remain safe and secure and able to obtain medical care; and,

WHEREAS, this proclamation will assist Illinois agencies in coordinating State and Federal resources, including materials needed to test for COVID-19, personal protective equipment, and medicines, in an effort to support the State responses as well as the responses of local governments to the present public health emergency; and,

WHEREAS, these conditions provide legal justification under Section 7 of the Illinois Emergency Management Agency Act for the new issuance of a proclamation of disaster; and,

WHEREAS, the Illinois Constitution, in Article V, Section 8, provides that "the Governor shall have the supreme executive power, and shall be responsible for the faithful execution of the laws," and states, in the Preamble, that a central purpose of the Illinois Constitution is "provide for the health, safety, and welfare of the people";

NOW, THEREFORE, in the interest of aiding the people of Illinois and the local governments responsible for ensuring public health and safety, I, JB Pritzker, Governor of the State of Illinois, hereby proclaim as follows:

**Section 1.** Pursuant to the provisions of Section 7 of the Illinois Emergency Management Agency Act, 20 ILCS 3305/7, I find that a disaster exists within the State of Illinois and specifically declare all counties in the State of Illinois as a disaster area. The proclamation authorizes the exercise of all of the emergency powers provided in Section 7 of the Illinois Emergency Management Agency Act, 20 ILCS 3305/7, including but not limited to those specific emergency powers set forth below.

**Section 2.** The Illinois Department of Public Health and the Illinois Emergency Management Agency are directed to coordinate with each other with respect to planning for and responding to the present public health emergency.

**Section 3.** The Illinois Department of Public Health is further directed to cooperate with the Governor, other State agencies and local authorities, including local public health authorities, in the development and implementation of strategies and plans to protect the public health in connection with the present public health emergency.

**Section 4.** The Illinois Emergency Management Agency is directed to implement the State Emergency Operations Plan to coordinate State resources to support local governments in disaster response and recovery operations.

**Section 5.** To aid with emergency purchases necessary for response and other emergency powers as authorized by the Illinois Emergency Management Agency Act, the provisions of the Illinois Procurement Code that would in any way prevent, hinder or delay necessary action in coping with the disaster are suspended to the extent they are not required by federal law. If necessary, and in accordance with Section 7(1) of the Illinois Emergency Management Agency Act, 20 ILCS 3305/7(1), the Governor may take appropriate executive action to suspend additional statutes, orders, rules, and regulations.

**Section 6.** Pursuant to Section 7(3) of the Illinois Emergency Management Agency Act, 20 ILCS 3305/7(3), this proclamation activates the Governor's authority, as necessary, to transfer the direction, personnel or functions of State departments and agencies or units thereof for the purpose of performing or facilitating emergency response programs.

**Section 7.** The Illinois Department of Public Health, Illinois Department of Insurance and the Illinois Department of Healthcare and Family Services are directed to recommend, and, as appropriate, take necessary actions to ensure expanded access to testing for COVID-19 and that consumers do not face financial barriers in accessing diagnostic testing and treatment services for COVID-19.

**Section 8.** The Illinois State Board of Education is directed to recommend, and, as appropriate, take necessary actions to address any impact to learning associated with the present public health emergency and to alleviate any barriers to the use of remote learning during the effect of this proclamation that exist in the Illinois School Code, 105 ILCS 5/1-1 et. seq.

**Section 9.** All State agencies are directed to cooperate with the Governor, other State agencies and local authorities in the development and implementation of strategies and plans to cope with and recover from the economic impact of the present public health emergency.

**Section 10.** Pursuant to Section 7(14) of the Illinois Emergency Management Agency Act, 20 ILCS 3305/7(14), increases in the selling price of goods or services, including medical supplies, protective equipment, medications and other commodities intended to assist in the prevention of or treatment and recovery of COVID-19, shall be prohibited in the State of Illinois while this proclamation is in effect.

**Section 11.** This proclamation can facilitate requests for federal emergency and/or disaster assistance if a complete and comprehensive assessment of damage indicates that effective recovery is beyond the capabilities of the State and affected local governments.

Section 12. This proclamation shall be effective immediately and remain in effect for 30 days.

*In Witness Whereof, I have hereunto set my hand and caused the Great Seal of the State of Illinois to be affixed.*

*Done at the Capitol in the City of Springfield this 30th day of April, in the Year of Our Lord two thousand and twenty, and of the State of Illinois two hundred and second.*



*Jesse White*
**SECRETARY OF STATE**

**GOVERNOR**

## EXECUTIVE BRANCH
## (20 ILCS 3305/) Illinois Emergency Management Agency Act.

(20 ILCS 3305/1) (from Ch. 127, par. 1051)
Sec. 1. Short Title. This Act may be cited as the Illinois Emergency Management Agency Act.
(Source: P.A. 87-168.)

(20 ILCS 3305/2) (from Ch. 127, par. 1052)
Sec. 2. Policy and Purposes.
(a) Because of the possibility of the occurrence of disasters of unprecedented size and destructiveness resulting from the explosion in this or in neighboring states of atomic or other means from without or by means of sabotage or other disloyal actions within, or from fire, flood, earthquake, telecommunications failure, or other natural or technological causes, and in order to insure that this State will be prepared to and will adequately deal with any disasters, preserve the lives and property of the people of this State and protect the public peace, health, and safety in the event of a disaster, it is found and declared to be necessary:
    (1) To create an Illinois Emergency Management Agency and to authorize emergency management programs within the political subdivisions of the State.
    (2) To confer upon the Governor and upon the principal executive officer of the political subdivisions of the State the powers provided herein.
    (3) To provide for the rendering of mutual aid among the political subdivisions and taxing districts of the State and with other states and with respect to the carrying out of an emergency management program.
    (b) It is further declared to be the purpose of this Act and the policy of the State that all emergency management programs of this State be coordinated to the maximum extent with the comparable programs of the federal government, including its various departments and agencies, of other states and localities and private agencies of every type, to the end that the most effective preparation and use may be made of the nation's resources and facilities for dealing with any disaster that may occur.
(Source: P.A. 87-168; 88-606, eff. 1-1-95.)

(20 ILCS 3305/3) (from Ch. 127, par. 1053)
Sec. 3. Limitations. Nothing in this Act shall be construed to:
    (a) Interfere with the course or conduct of a labor dispute, except that actions otherwise authorized by this Act or other laws may be taken when necessary to mitigate imminent or existing danger to public health or safety;



(b) Interfere with dissemination of news or comment of public affairs; but any communications facility or organization (including but not limited to radio and television stations, wire services, and newspapers) may be requested to transmit or print public service messages furnishing information or instructions in connection with a disaster;

(c) Affect the jurisdiction or responsibilities of police forces, fire fighting forces, units of the armed forces of the United States, or of any personnel thereof, when on active duty; but State and political subdivision emergency operations plans shall place reliance upon the forces available for performance of functions related to emergency management;.

(d) Limit, modify, or abridge the authority of the Governor to proclaim martial law or exercise any other powers vested in the Governor under the constitution, statutes, or common law of this State, independent of or in conjunction with any provisions of this Act; limit any home rule unit; or prohibit any contract or association pursuant to Article VII, Section 10 of the Illinois Constitution.
(Source: P.A. 92-73, eff. 1-1-02.)

(20 ILCS 3305/4) (from Ch. 127, par. 1054)
Sec. 4. Definitions. As used in this Act, unless the context clearly indicates otherwise, the following words and terms have the meanings ascribed to them in this Section:

"Coordinator" means the staff assistant to the principal executive officer of a political subdivision with the duty of coordinating the emergency management programs of that political subdivision.

"Disaster" means an occurrence or threat of widespread or severe damage, injury or loss of life or property resulting from any natural or technological cause, including but not limited to fire, flood, earthquake, wind, storm, hazardous materials spill or other water contamination requiring emergency action to avert danger or damage, epidemic, air contamination, blight, extended periods of severe and inclement weather, drought, infestation, critical shortages of essential fuels and energy, explosion, riot, hostile military or paramilitary action, public health emergencies, or acts of domestic terrorism.

"Emergency Management" means the efforts of the State and the political subdivisions to develop, plan, analyze, conduct, provide, implement and maintain programs for disaster mitigation, preparedness, response and recovery.

"Emergency Services and Disaster Agency" means the agency by this name, by the name Emergency Management Agency, or by any other name that is established by ordinance within a political subdivision to coordinate the emergency management program within that political subdivision and with private organizations, other political subdivisions, the State and federal governments.

"Emergency Operations Plan" means the written plan of the

State and political subdivisions describing the organization, mission, and functions of the government and supporting services for responding to and recovering from disasters and shall include plans that take into account the needs of those individuals with household pets and service animals following a major disaster or emergency.

"Emergency Services" means the coordination of functions by the State and its political subdivision, other than functions for which military forces are primarily responsible, as may be necessary or proper to prevent, minimize, repair, and alleviate injury and damage resulting from any natural or technological causes. These functions include, without limitation, fire fighting services, police services, emergency aviation services, medical and health services, HazMat and technical rescue teams, rescue, engineering, warning services, communications, radiological, chemical and other special weapons defense, evacuation of persons from stricken or threatened areas, emergency assigned functions of plant protection, temporary restoration of public utility services and other functions related to civilian protection, together with all other activities necessary or incidental to protecting life or property.

"Exercise" means a planned event realistically simulating a disaster, conducted for the purpose of evaluating the political subdivision's coordinated emergency management capabilities, including, but not limited to, testing the emergency operations plan.

"HazMat team" means a career or volunteer mobile support team that has been authorized by a unit of local government to respond to hazardous materials emergencies and that is primarily designed for emergency response to chemical or biological terrorism, radiological emergencies, hazardous material spills, releases, or fires, or other contamination events.

"Illinois Emergency Management Agency" means the agency established by this Act within the executive branch of State Government responsible for coordination of the overall emergency management program of the State and with private organizations, political subdivisions, and the federal government. Illinois Emergency Management Agency also means the State Emergency Response Commission responsible for the implementation of Title III of the Superfund Amendments and Reauthorization Act of 1986.

"Mobile Support Team" means a group of individuals designated as a team by the Governor or Director to train prior to and to be dispatched, if the Governor or the Director so determines, to aid and reinforce the State and political subdivision emergency management efforts in response to a disaster.

"Municipality" means any city, village, and incorporated town.

"Political Subdivision" means any county, city, village, or incorporated town or township if the township is in a county having a population of more than 2,000,000.

"Principal Executive Officer" means chair of the county board, supervisor of a township if the township is in a county having a population of more than 2,000,000, mayor of a city or

incorporated town, president of a village, or in their absence or disability, the interim successor as established under Section 7 of the Emergency Interim Executive Succession Act.

"Public health emergency" means an occurrence or imminent threat of an illness or health condition that:

    (a) is believed to be caused by any of the following:

        (i) bioterrorism;

        (ii) the appearance of a novel or previously controlled or eradicated infectious agent or biological toxin;

        (iii) a natural disaster;

        (iv) a chemical attack or accidental release; or

        (v) a nuclear attack or accident; and

    (b) poses a high probability of any of the following harms:

        (i) a large number of deaths in the affected population;

        (ii) a large number of serious or long-term disabilities in the affected population; or

        (iii) widespread exposure to an infectious or toxic agent that poses a significant risk of substantial future harm to a large number of people in the affected population.

"Statewide mutual aid organization" means an entity with local government members throughout the State that facilitates temporary assistance through its members in a particular public safety discipline, such as police, fire or emergency management, when an occurrence exceeds a member jurisdiction's capabilities.

"Technical rescue team" means a career or volunteer mobile support team that has been authorized by a unit of local government to respond to building collapse, high angle rescue, and other specialized rescue emergencies and that is primarily designated for emergency response to technical rescue events. (Source: P.A. 100-587, eff. 6-4-18.)

(20 ILCS 3305/5) (from Ch. 127, par. 1055)

Sec. 5. Illinois Emergency Management Agency.

(a) There is created within the executive branch of the State Government an Illinois Emergency Management Agency and a Director of the Illinois Emergency Management Agency, herein called the "Director" who shall be the head thereof. The Director shall be appointed by the Governor, with the advice and consent of the Senate, and shall serve for a term of 2 years beginning on the third Monday in January of the odd-numbered year, and until a successor is appointed and has qualified; except that the term of the first Director appointed under this Act shall expire on the third Monday in January, 1989. The Director shall not hold any other remunerative public office. For terms ending before December 31, 2019, the Director shall receive an annual salary as set by the Compensation Review Board. For terms beginning after the effective date of this amendatory Act of the 100th General

Assembly, the annual salary of the Director shall be as provided in Section 5-300 of the Civil Administrative Code of Illinois.

(b) The Illinois Emergency Management Agency shall obtain, under the provisions of the Personnel Code, technical, clerical, stenographic and other administrative personnel, and may make expenditures within the appropriation therefor as may be necessary to carry out the purpose of this Act. The agency created by this Act is intended to be a successor to the agency created under the Illinois Emergency Services and Disaster Agency Act of 1975 and the personnel, equipment, records, and appropriations of that agency are transferred to the successor agency as of June 30, 1988 (the effective date of this Act).

(c) The Director, subject to the direction and control of the Governor, shall be the executive head of the Illinois Emergency Management Agency and the State Emergency Response Commission and shall be responsible under the direction of the Governor, for carrying out the program for emergency management of this State. The Director shall also maintain liaison and cooperate with the emergency management organizations of this State and other states and of the federal government.

(d) The Illinois Emergency Management Agency shall take an integral part in the development and revision of political subdivision emergency operations plans prepared under paragraph (f) of Section 10. To this end it shall employ or otherwise secure the services of professional and technical personnel capable of providing expert assistance to the emergency services and disaster agencies. These personnel shall consult with emergency services and disaster agencies on a regular basis and shall make field examinations of the areas, circumstances, and conditions that particular political subdivision emergency operations plans are intended to apply.

(e) The Illinois Emergency Management Agency and political subdivisions shall be encouraged to form an emergency management advisory committee composed of private and public personnel representing the emergency management phases of mitigation, preparedness, response, and recovery. The Local Emergency Planning Committee, as created under the Illinois Emergency Planning and Community Right to Know Act, shall serve as an advisory committee to the emergency services and disaster agency or agencies serving within the boundaries of that Local Emergency Planning Committee planning district for:

(1) the development of emergency operations plan provisions for hazardous chemical emergencies; and

(2) the assessment of emergency response capabilities related to hazardous chemical emergencies.

(f) The Illinois Emergency Management Agency shall:

(1) Coordinate the overall emergency management program of the State.

(2) Cooperate with local governments, the federal government and any public or private agency or entity in achieving any purpose of this Act and in implementing emergency management programs for mitigation, preparedness, response, and recovery.

(2.5) Develop a comprehensive emergency preparedness

and response plan for any nuclear accident in accordance
with Section 65 of the Nuclear Safety Law of 2004 and in
development of the Illinois Nuclear Safety Preparedness
program in accordance with Section 8 of the Illinois
Nuclear Safety Preparedness Act.

(2.6) Coordinate with the Department of Public Health
with respect to planning for and responding to public
health emergencies.

(3) Prepare, for issuance by the Governor, executive
orders, proclamations, and regulations as necessary or
appropriate in coping with disasters.

(4) Promulgate rules and requirements for political
subdivision emergency operations plans that are not
inconsistent with and are at least as stringent as
applicable federal laws and regulations.

(5) Review and approve, in accordance with Illinois
Emergency Management Agency rules, emergency operations
plans for those political subdivisions required to have an
emergency services and disaster agency pursuant to this
Act.

(5.5) Promulgate rules and requirements for the
political subdivision emergency management exercises,
including, but not limited to, exercises of the emergency
operations plans.

(5.10) Review, evaluate, and approve, in accordance
with Illinois Emergency Management Agency rules, political
subdivision emergency management exercises for those
political subdivisions required to have an emergency
services and disaster agency pursuant to this Act.

(6) Determine requirements of the State and its
political subdivisions for food, clothing, and other
necessities in event of a disaster.

(7) Establish a register of persons with types of
emergency management training and skills in mitigation,
preparedness, response, and recovery.

(8) Establish a register of government and private
response resources available for use in a disaster.

(9) Expand the Earthquake Awareness Program and its
efforts to distribute earthquake preparedness materials to
schools, political subdivisions, community groups, civic
organizations, and the media. Emphasis will be placed on
those areas of the State most at risk from an earthquake.
Maintain the list of all school districts, hospitals,
airports, power plants, including nuclear power plants,
lakes, dams, emergency response facilities of all types,
and all other major public or private structures which are
at the greatest risk of damage from earthquakes under
circumstances where the damage would cause subsequent harm
to the surrounding communities and residents.

(10) Disseminate all information, completely and
without delay, on water levels for rivers and streams and
any other data pertaining to potential flooding supplied
by the Division of Water Resources within the Department
of Natural Resources to all political subdivisions to the
maximum extent possible.

(11) Develop agreements, if feasible, with medical

supply and equipment firms to supply resources as are
necessary to respond to an earthquake or any other
disaster as defined in this Act. These resources will be
made available upon notifying the vendor of the disaster.
Payment for the resources will be in accordance with
Section 7 of this Act. The Illinois Department of Public
Health shall determine which resources will be required
and requested.

(11.5) In coordination with the Department of State
Police, develop and implement a community outreach program
to promote awareness among the State's parents and
children of child abduction prevention and response.

(12) Out of funds appropriated for these purposes,
award capital and non-capital grants to Illinois hospitals
or health care facilities located outside of a city with a
population in excess of 1,000,000 to be used for purposes
that include, but are not limited to, preparing to respond
to mass casualties and disasters, maintaining and
improving patient safety and quality of care, and
protecting the confidentiality of patient information. No
single grant for a capital expenditure shall exceed
$300,000. No single grant for a non-capital expenditure
shall exceed $100,000. In awarding such grants, preference
shall be given to hospitals that serve a significant
number of Medicaid recipients, but do not qualify for
disproportionate share hospital adjustment payments under
the Illinois Public Aid Code. To receive such a grant, a
hospital or health care facility must provide funding of
at least 50% of the cost of the project for which the
grant is being requested. In awarding such grants the
Illinois Emergency Management Agency shall consider the
recommendations of the Illinois Hospital Association.

(13) Do all other things necessary, incidental or
appropriate for the implementation of this Act.

(g) The Illinois Emergency Management Agency is authorized
to make grants to various higher education institutions,
public K-12 school districts, area vocational centers as
designated by the State Board of Education, inter-district
special education cooperatives, regional safe schools, and
nonpublic K-12 schools for safety and security improvements.
For the purpose of this subsection (g), "higher education
institution" means a public university, a public community
college, or an independent, not-for-profit or for-profit
higher education institution located in this State. Grants
made under this subsection (g) shall be paid out of moneys
appropriated for that purpose from the Build Illinois Bond
Fund. The Illinois Emergency Management Agency shall adopt
rules to implement this subsection (g). These rules may
specify: (i) the manner of applying for grants; (ii) project
eligibility requirements; (iii) restrictions on the use of
grant moneys; (iv) the manner in which the various higher
education institutions must account for the use of grant
moneys; and (v) any other provision that the Illinois
Emergency Management Agency determines to be necessary or
useful for the administration of this subsection (g).

(g-5) The Illinois Emergency Management Agency is
authorized to make grants to not-for-profit organizations

which are exempt from federal income taxation under section
501(c)(3) of the Federal Internal Revenue Code for eligible
security improvements that assist the organization in
preventing, preparing for, or responding to acts of terrorism.
The Director shall establish procedures and forms by which
applicants may apply for a grant and procedures for
distributing grants to recipients. The procedures shall
require each applicant to do the following:

    (1) identify and substantiate prior threats or
attacks by a terrorist organization, network, or cell
against the not-for-profit organization;

    (2) indicate the symbolic or strategic value of one
or more sites that renders the site a possible target of
terrorism;

    (3) discuss potential consequences to the
organization if the site is damaged, destroyed, or
disrupted by a terrorist act;

    (4) describe how the grant will be used to
integrate organizational preparedness with broader State
and local preparedness efforts;

    (5) submit a vulnerability assessment conducted by
experienced security, law enforcement, or military
personnel, and a description of how the grant award will
be used to address the vulnerabilities identified in the
assessment; and

    (6) submit any other relevant information as may be
required by the Director.

The Agency is authorized to use funds appropriated for the
grant program described in this subsection (g-5) to administer
the program.

    (h) Except as provided in Section 17.5 of this Act, any
moneys received by the Agency from donations or sponsorships
shall be deposited in the Emergency Planning and Training Fund
and used by the Agency, subject to appropriation, to
effectuate planning and training activities.

    (i) The Illinois Emergency Management Agency may by rule
assess and collect reasonable fees for attendance at Agency-
sponsored conferences to enable the Agency to carry out the
requirements of this Act. Any moneys received under this
subsection shall be deposited in the Emergency Planning and
Training Fund and used by the Agency, subject to
appropriation, for planning and training activities.

    (j) The Illinois Emergency Management Agency is authorized
to make grants to other State agencies, public universities,
units of local government, and statewide mutual aid
organizations to enhance statewide emergency preparedness and
response.

(Source: P.A. 100-444, eff. 1-1-18; 100-508, eff. 9-15-17;
100-587, eff. 6-4-18; 100-863, eff. 8-14-18; 100-1179, eff. 1-
18-19.)

(20 ILCS 3305/6) (from Ch. 127, par. 1056)
Sec. 6. Emergency Management Powers of the Governor.

(a) The Governor shall have general direction and control of the Illinois Emergency Management Agency and shall be responsible for the carrying out of the provisions of this Act.

(b) In performing duties under this Act, the Governor is authorized to cooperate with the federal government and with other states in all matters pertaining to emergency management.

(c) In performing duties under this Act, the Governor is further authorized:

(1) To make, amend, and rescind all lawful necessary orders, rules, and regulations to carry out the provisions of this Act within the limits of the authority conferred upon the Governor.

(2) To cause to be prepared a comprehensive plan and program for the emergency management of this State, which plan and program shall be integrated into and coordinated with emergency management plans and programs of the federal government and of other states whenever possible and which plan and program may include:

a. Mitigation of injury and damage caused by disaster.

b. Prompt and effective response to disaster.

c. Emergency relief.

d. Identification of areas particularly vulnerable to disasters.

e. Recommendations for zoning, building, and other land-use controls, safety measures for securing permanent structures and other mitigation measures designed to eliminate or reduce disasters or their impact.

f. Assistance to political subdivisions in designing emergency operations plans.

g. Authorization and procedures for the erection or other construction of temporary works designed to mitigate danger, damage or loss from flood, or other disaster.

h. Preparation and distribution to the appropriate State and political subdivision officials of a State catalog of federal, State, and private assistance programs.

i. Organization of State personnel and chains of command.

j. Coordination of federal, State, and political subdivision emergency management activities.

k. Other necessary matters.

(3) In accordance with the plan and program for the emergency management of this State, and out of funds appropriated for these purposes, to procure and preposition supplies, medicines, materials and equipment, to institute training programs and public information programs, and to take all other preparatory steps including the partial or full mobilization of emergency services and disaster agencies in advance of actual disaster to insure the furnishing of adequately trained and equipped forces for disaster response and recovery.

(4) Out of funds appropriated for these purposes, to

make studies and surveys of the industries, resources, and facilities in this State as may be necessary to ascertain the capabilities of the State for emergency management phases of mitigation, preparedness, response, and recovery and to plan for the most efficient emergency use thereof.

(5) On behalf of this State, to negotiate for and submit to the General Assembly for its approval or rejection reciprocal mutual aid agreements or compacts with other states, either on a statewide or political subdivision basis. The agreements or compacts, shall be limited to the furnishing or exchange of food, clothing, medical or other supplies, engineering and police services; emergency housing and feeding; National and State Guards while under the control of the State; health, medical, and related services; fire fighting, rescue, transportation, communication, and construction services and equipment, provided, however, that if the General Assembly be not in session and the Governor has not proclaimed the existence of a disaster under this Section, then the agreements or compacts shall instead be submitted to an Interim Committee on Emergency Management composed of 5 Senators appointed by the President of the Senate and of 5 Representatives appointed by the Speaker of the House, during the month of June of each odd-numbered year to serve for a 2 year term, beginning July 1 of that year, and until their successors are appointed and qualified, or until termination of their legislative service, whichever first occurs. Vacancies shall be filled by appointment for the unexpired term in the same manner as original appointments. All appointments shall be made in writing and filed with the Secretary of State as a public record. The Committee shall have the power to approve or reject any agreements or compacts for and on behalf of the General Assembly; and, provided further, that an affirmative vote of 2/3 of the members of the Committee shall be necessary for the approval of any agreement or compact.
(Source: P.A. 92-73, eff. 1-1-02.)


(20 ILCS 3305/7) (from Ch. 127, par. 1057)
Sec. 7. Emergency Powers of the Governor. In the event of a disaster, as defined in Section 4, the Governor may, by proclamation declare that a disaster exists. Upon such proclamation, the Governor shall have and may exercise for a period not to exceed 30 days the following emergency powers; provided, however, that the lapse of the emergency powers shall not, as regards any act or acts occurring or committed within the 30-day period, deprive any person, firm, corporation, political subdivision, or body politic of any right or rights to compensation or reimbursement which he, she, it, or they may have under the provisions of this Act:
(1) To suspend the provisions of any regulatory

statute prescribing procedures for conduct of State
business, or the orders, rules and regulations of any
State agency, if strict compliance with the provisions of
any statute, order, rule, or regulation would in any way
prevent, hinder or delay necessary action, including
emergency purchases, by the Illinois Emergency Management
Agency, in coping with the disaster.

(2) To utilize all available resources of the State
government as reasonably necessary to cope with the
disaster and of each political subdivision of the State.

(3) To transfer the direction, personnel or functions
of State departments and agencies or units thereof for the
purpose of performing or facilitating disaster response
and recovery programs.

(4) On behalf of this State to take possession of,
and to acquire full title or a lesser specified interest
in, any personal property as may be necessary to
accomplish the objectives set forth in Section 2 of this
Act, including: airplanes, automobiles, trucks, trailers,
buses, and other vehicles; coal, oils, gasoline, and other
fuels and means of propulsion; explosives, materials,
equipment, and supplies; animals and livestock; feed and
seed; food and provisions for humans and animals; clothing
and bedding; and medicines and medical and surgical
supplies; and to take possession of and for a limited
period occupy and use any real estate necessary to
accomplish those objectives; but only upon the undertaking
by the State to pay just compensation therefor as in this
Act provided, and then only under the following
provisions:

a. The Governor, or the person or persons as the
Governor may authorize so to do, may forthwith take
possession of property for and on behalf of the State;
provided, however, that the Governor or persons shall
simultaneously with the taking, deliver to the owner
or his or her agent, if the identity of the owner or
agency is known or readily ascertainable, a signed
statement in writing, that shall include the name and
address of the owner, the date and place of the
taking, description of the property sufficient to
identify it, a statement of interest in the property
that is being so taken, and, if possible, a statement
in writing, signed by the owner, setting forth the sum
that he or she is willing to accept as just
compensation for the property or use. Whether or not
the owner or agent is known or readily ascertainable,
a true copy of the statement shall promptly be filed
by the Governor or the person with the Director, who
shall keep the docket of the statements. In cases
where the sum that the owner is willing to accept as
just compensation is less than $1,000, copies of the
statements shall also be filed by the Director with,
and shall be passed upon by an Emergency Management
Claims Commission, consisting of 3 disinterested
citizens who shall be appointed by the Governor, by
and with the advice and consent of the Senate, within
20 days after the Governor's declaration of a

disaster, and if the sum fixed by them as just
compensation be less than $1,000 and is accepted in
writing by the owner, then the State Treasurer out of
funds appropriated for these purposes, shall, upon
certification thereof by the Emergency Management
Claims Commission, cause the sum so certified
forthwith to be paid to the owner. The Emergency
Management Claims Commission is hereby given the power
to issue appropriate subpoenas and to administer oaths
to witnesses and shall keep appropriate minutes and
other records of its actions upon and the disposition
made of all claims.

b. When the compensation to be paid for the
taking or use of property or interest therein is not
or cannot be determined and paid under item a of this
paragraph (4), a petition in the name of The People of
the State of Illinois shall be promptly filed by the
Director, which filing may be enforced by mandamus, in
the circuit court of the county where the property or
any part thereof was located when initially taken or
used under the provisions of this Act praying that the
amount of compensation to be paid to the person or
persons interested therein be fixed and determined.
The petition shall include a description of the
property that has been taken, shall state the physical
condition of the property when taken, shall name as
defendants all interested parties, shall set forth the
sum of money estimated to be just compensation for the
property or interest therein taken or used, and shall
be signed by the Director. The litigation shall be
handled by the Attorney General for and on behalf of
the State.

c. Just compensation for the taking or use of
property or interest therein shall be promptly
ascertained in proceedings and established by judgment
against the State, that shall include, as part of the
just compensation so awarded, interest at the rate of
6% per annum on the fair market value of the property
or interest therein from the date of the taking or use
to the date of the judgment; and the court may order
the payment of delinquent taxes and special
assessments out of the amount so awarded as just
compensation and may make any other orders with
respect to encumbrances, rents, insurance, and other
charges, if any, as shall be just and equitable.

(5) When required by the exigencies of the disaster,
to sell, lend, rent, give, or distribute all or any part
of property so or otherwise acquired to the inhabitants of
this State, or to political subdivisions of this State,
or, under the interstate mutual aid agreements or compacts
as are entered into under the provisions of subparagraph
(5) of paragraph (c) of Section 6 to other states, and to
account for and transmit to the State Treasurer all funds,
if any, received therefor.

(6) To recommend the evacuation of all or part of the
population from any stricken or threatened area within the
State if the Governor deems this action necessary.

(7) To prescribe routes, modes of transportation, and destinations in connection with evacuation.

(8) To control ingress and egress to and from a disaster area, the movement of persons within the area, and the occupancy of premises therein.

(9) To suspend or limit the sale, dispensing, or transportation of alcoholic beverages, firearms, explosives, and combustibles.

(10) To make provision for the availability and use of temporary emergency housing.

(11) A proclamation of a disaster shall activate the State Emergency Operations Plan, and political subdivision emergency operations plans applicable to the political subdivision or area in question and be authority for the deployment and use of any forces that the plan or plans apply and for use or distribution of any supplies, equipment, and materials and facilities assembled, stockpiled or arranged to be made available under this Act or any other provision of law relating to disasters.

(12) Control, restrict, and regulate by rationing, freezing, use of quotas, prohibitions on shipments, price fixing, allocation or other means, the use, sale or distribution of food, feed, fuel, clothing and other commodities, materials, goods, or services; and perform and exercise any other functions, powers, and duties as may be necessary to promote and secure the safety and protection of the civilian population.

(13) During the continuance of any disaster the Governor is commander-in-chief of the organized and unorganized militia and of all other forces available for emergency duty. To the greatest extent practicable, the Governor shall delegate or assign command authority to do so by orders issued at the time of the disaster.

(14) Prohibit increases in the prices of goods and services during a disaster.
(Source: P.A. 100-863, eff. 8-14-18.)

(20 ILCS 3305/8) (from Ch. 127, par. 1058)
Sec. 8. Mobile Support Teams.

(a) The Governor or Director may cause to be created Mobile Support Teams to aid and to reinforce the Illinois Emergency Management Agency, and emergency services and disaster agencies in areas stricken by disaster. Each mobile support team shall have a leader, selected by the Director who will be responsible, under the direction and control of the Director, for the organization, administration, and training, and operation of the mobile support team.

(b) Personnel of a mobile support team while on duty pursuant to such a call or while engaged in regularly scheduled training or exercises, whether within or without the State, shall either:

(1) If they are paid employees of the State, have the

powers, duties, rights, privileges and immunities and receive the compensation incidental to their employment.

(2) If they are paid employees of a political subdivision or body politic of this State, and whether serving within or without that political subdivision or body politic, have the powers, duties, rights, privileges and immunities, and receive the compensation incidental to their employment.

(3) If they are not employees of the State, political subdivision or body politic, or being such employees, are not normally paid for their services, be entitled to at least one dollar per year compensation from the State.

Personnel of a mobile support team who suffer disease, injury or death arising out of or in the course of emergency duty, shall for the purposes of benefits under the Workers' Compensation Act or Workers' Occupational Diseases Act only, be deemed to be employees of this State. If the person diseased, injured or killed is an employee described in item (3) above, the computation of benefits payable under either of those Acts shall be based on income commensurate with comparable State employees doing the same type of work or income from the person's regular employment, whichever is greater.

All personnel of mobile support teams shall, while on duty under such call, be reimbursed by this State for all actual and necessary travel and subsistence expenses.

(c) The State shall reimburse each political subdivision or body politic from the Disaster Response and Recovery Fund for the compensation paid and the actual and necessary travel, subsistence and maintenance expenses of paid employees of the political subdivision or body politic while serving, outside of its geographical boundaries pursuant to such a call, as members of a mobile support team, and for all payments made for death, disease or injury of those paid employees arising out of and incurred in the course of that duty, and for all losses of or damage to supplies and equipment of the political subdivision or body politic resulting from the operations.

(d) Whenever mobile support teams or units of another state, while the Governor has the emergency powers provided for under Section 7 of this Act, render aid to this State under the orders of the Governor of its home state and upon the request of the Governor of this State, all questions relating to reimbursement by this State to the other state and its citizens in regard to the assistance so rendered shall be determined by the mutual aid agreements or interstate compacts described in subparagraph (5) of paragraph (c) of Section 6 as are existing at the time of the assistance rendered or are entered into thereafter and under Section 303 (d) of the Federal Civil Defense Act of 1950.

(e) No personnel of mobile support teams of this State may be ordered by the Governor to operate in any other state unless a request for the same has been made by the Governor or duly authorized representative of the other state.
(Source: P.A. 98-465, eff. 8-16-13.)

(20 ILCS 3305/9) (from Ch. 127, par. 1059)
Sec. 9. Financing.
(a) It is the intent of the Legislature and declared to be the policy of the State that funds to meet disasters shall always be available.

(b) It is the legislative intent that the first recourse shall be to funds regularly appropriated to State and political subdivision departments and agencies. If the Governor finds that the demands placed upon these funds in coping with a particular disaster are unreasonably great, the Governor may make funds available from the Disaster Response and Recovery Fund. If monies available from the Fund are insufficient, and if the Governor finds that other sources of money to cope with the disaster are not available or are insufficient, the Governor shall request the General Assembly to enact legislation as it may deem necessary to transfer and expend monies appropriated for other purposes or borrow, for a term not to exceed 2 years from the United States government or other public or private source. If the General Assembly is not sitting in regular session to enact such legislation for the transfer, expenditure or loan of such monies, and the President of the Senate and the Speaker of the House certify that the Senate and House are not in session, the Governor is authorized to carry out those decisions, by depositing transfers or loan proceeds into and making expenditures from the Disaster Response and Recovery Fund, until such time as a quorum of the General Assembly can convene in a regular or extraordinary session. The General Assembly shall, to the extent moneys become available, restore moneys used from other sources under this Section.

(c) Nothing contained in this Section shall be construed to limit the Governor's authority to apply for, administer and expend grants, gifts or payments in aid of disaster mitigation, preparedness, response or recovery.
(Source: P.A. 98-465, eff. 8-16-13.)

(20 ILCS 3305/10) (from Ch. 127, par. 1060)
Sec. 10. Emergency Services and Disaster Agencies.
(a) Each political subdivision within this State shall be within the jurisdiction of and served by the Illinois Emergency Management Agency and by an emergency services and disaster agency responsible for emergency management programs. A township, if the township is in a county having a population of more than 2,000,000, must have approval of the county coordinator before establishment of a township emergency services and disaster agency.

(b) Unless multiple county emergency services and disaster agency consolidation is authorized by the Illinois Emergency Management Agency with the consent of the respective counties,

each county shall maintain an emergency services and disaster agency that has jurisdiction over and serves the entire county, except as otherwise provided under this Act and except that in any county with a population of over 3,000,000 containing a municipality with a population of over 500,000 the jurisdiction of the county agency shall not extend to the municipality when the municipality has established its own agency.

(c) Each municipality with a population of over 500,000 shall maintain an emergency services and disaster agency which has jurisdiction over and serves the entire municipality. A municipality with a population less than 500,000 may establish, by ordinance, an agency or department responsible for emergency management within the municipality's corporate limits.

(d) The Governor shall determine which municipal corporations, other than those specified in paragraph (c) of this Section, need emergency services and disaster agencies of their own and require that they be established and maintained. The Governor shall make these determinations on the basis of the municipality's disaster vulnerability and capability of response related to population size and concentration. The emergency services and disaster agency of a county or township, shall not have a jurisdiction within a political subdivision having its own emergency services and disaster agency, but shall cooperate with the emergency services and disaster agency of a city, village or incorporated town within their borders. The Illinois Emergency Management Agency shall publish and furnish a current list to the municipalities required to have an emergency services and disaster agency under this subsection.

(e) Each municipality that is not required to and does not have an emergency services and disaster agency shall have a liaison officer designated to facilitate the cooperation and protection of that municipal corporation with the county emergency services and disaster agency in which it is located in the work of disaster mitigation, preparedness, response, and recovery.

(f) The principal executive officer or his or her designee of each political subdivision in the State shall annually notify the Illinois Emergency Management Agency of the manner in which the political subdivision is providing or securing emergency management, identify the executive head of the agency or the department from which the service is obtained, or the liaison officer in accordance with paragraph (d) of this Section and furnish additional information relating thereto as the Illinois Emergency Management Agency requires.

(g) Each emergency services and disaster agency shall prepare an emergency operations plan for its geographic boundaries that complies with planning, review, and approval standards promulgated by the Illinois Emergency Management Agency. The Illinois Emergency Management Agency shall determine which jurisdictions will be required to include earthquake preparedness in their local emergency operations plans.

(h) The emergency services and disaster agency shall prepare and distribute to all appropriate officials in written

form a clear and complete statement of the emergency responsibilities of all local departments and officials and of the disaster chain of command.

(i) Each emergency services and disaster agency shall have a Coordinator who shall be appointed by the principal executive officer of the political subdivision in the same manner as are the heads of regular governmental departments. If the political subdivision is a county and the principal executive officer appoints the sheriff as the Coordinator, the sheriff may, in addition to his or her regular compensation, receive compensation at the same level as provided in Section 3 of "An Act in relation to the regulation of motor vehicle traffic and the promotion of safety on public highways in counties", approved August 9, 1951, as amended. The Coordinator shall have direct responsibility for the organization, administration, training, and operation of the emergency services and disaster agency, subject to the direction and control of that principal executive officer. Each emergency services and disaster agency shall coordinate and may perform emergency management functions within the territorial limits of the political subdivision within which it is organized as are prescribed in and by the State Emergency Operations Plan, and programs, orders, rules and regulations as may be promulgated by the Illinois Emergency Management Agency and by local ordinance and, in addition, shall conduct such functions outside of those territorial limits as may be required under mutual aid agreements and compacts as are entered into under subparagraph (5) of paragraph (c) of Section 6.

(j) In carrying out the provisions of this Act, each political subdivision may enter into contracts and incur obligations necessary to place it in a position effectively to combat the disasters as are described in Section 4, to protect the health and safety of persons, to protect property, and to provide emergency assistance to victims of those disasters. If a disaster occurs, each political subdivision may exercise the powers vested under this Section in the light of the exigencies of the disaster and, excepting mandatory constitutional requirements, without regard to the procedures and formalities normally prescribed by law pertaining to the performance of public work, entering into contracts, the incurring of obligations, the employment of temporary workers, the rental of equipment, the purchase of supplies and materials, and the appropriation, expenditure, and disposition of public funds and property.

(k) Volunteers who, while engaged in a disaster, an exercise, training related to the emergency operations plan of the political subdivision, or a search-and-rescue team response to an occurrence or threat of injury or loss of life that is beyond local response capabilities, suffer disease, injury or death, shall, for the purposes of benefits under the Workers' Compensation Act or Workers' Occupational Diseases Act only, be deemed to be employees of the State, if: (1) the claimant is a duly qualified and enrolled (sworn in) as a volunteer of the Illinois Emergency Management Agency or an emergency services and disaster agency accredited by the Illinois Emergency Management Agency, and (2) if: (i) the

claimant was participating in a disaster as defined in Section
4 of this Act, (ii) the exercise or training participated in
was specifically and expressly approved by the Illinois
Emergency Management Agency prior to the exercise or training,
or (iii) the search-and-rescue team response was to an
occurrence or threat of injury or loss of life that was beyond
local response capabilities and was specifically and expressly
approved by the Illinois Emergency Management Agency prior to
the search-and-rescue team response. The computation of
benefits payable under either of those Acts shall be based on
the income commensurate with comparable State employees doing
the same type work or income from the person's regular
employment, whichever is greater.

Volunteers who are working under the direction of an
emergency services and disaster agency accredited by the
Illinois Emergency Management Agency, pursuant to a plan
approved by the Illinois Emergency Management Agency (i)
during a disaster declared by the Governor under Section 7 of
this Act, or (ii) in circumstances otherwise expressly
approved by the Illinois Emergency Management Agency, shall be
deemed exclusively employees of the State for purposes of
Section 8(d) of the Court of Claims Act, provided that the
Illinois Emergency Management Agency may, in coordination with
the emergency services and disaster agency, audit
implementation for compliance with the plan.

(l) If any person who is entitled to receive benefits
through the application of this Section receives, in
connection with the disease, injury or death giving rise to
such entitlement, benefits under an Act of Congress or federal
program, benefits payable under this Section shall be reduced
to the extent of the benefits received under that other Act or
program.

(m) (1) Prior to conducting an exercise, the principal
    executive officer of a political subdivision or his or her
    designee shall provide area media with written
    notification of the exercise. The notification shall
    indicate that information relating to the exercise shall
    not be released to the public until the commencement of
    the exercise. The notification shall also contain a
    request that the notice be so posted to ensure that all
    relevant media personnel are advised of the exercise
    before it begins.

    (2) During the conduct of an exercise, all messages,
    two-way radio communications, briefings, status reports,
    news releases, and other oral or written communications
    shall begin and end with the following statement: "This is
    an exercise message".
(Source: P.A. 94-733, eff. 4-27-06.)


    (20 ILCS 3305/11) (from Ch. 127, par. 1061)
    Sec. 11. Local Disaster Declarations.
    (a) A local disaster may be declared only by the principal
executive officer of a political subdivision, or his or her

interim emergency successor, as provided in Section 7 of the
"Emergency Interim Executive Succession Act". It shall not be
continued or renewed for a period in excess of 7 days except
by or with the consent of the governing board of the political
subdivision. Any order or proclamation declaring, continuing,
or terminating a local disaster shall be given prompt and
general publicity and shall be filed promptly with the county
clerk, township clerk, or the municipal clerk, as the case may
be, in the area to which it applies.
    (b) The effect of a declaration of a local disaster is to
activate the emergency operations plan of that political
subdivision and to authorize the furnishing of aid and
assistance thereunder.
(Source: P.A. 92-73, eff. 1-1-02.)


    (20 ILCS 3305/12) (from Ch. 127, par. 1062)
    Sec. 12. Testing of Disaster Warning Devices. The testing
of disaster warning devices including outdoor warning sirens
shall be held only on the first Tuesday of each month at 10
o'clock in the morning or during exercises that are
specifically and expressly approved in advance by the Illinois
Emergency Management Agency.
(Source: P.A. 92-73, eff. 1-1-02.)


    (20 ILCS 3305/13) (from Ch. 127, par. 1063)
    Sec. 13. Mutual aid arrangements between political
subdivisions and taxing districts.
    (a) The coordinator of each emergency services and
disaster agency may, in collaboration with other public
agencies within his or her immediate vicinity, develop or
cause to be developed mutual aid arrangements with other
political subdivisions of taxing districts within this State
for reciprocal disaster response and recovery assistance in
case a disaster is too great to be dealt with unassisted. The
mutual aid shall not, however, be effective unless and until
approved by each of the political subdivisions. The
arrangements shall be consistent with the State Emergency
Operations Plan and State emergency management program, and in
the event of a disaster as described in Section 4 of this Act,
it shall be the duty of each emergency services and disaster
agency to render assistance in accordance with the provisions
of the mutual aid arrangements.
    (b) The coordinator of an emergency services and disaster
agency may, subject to the approval of the Director, assist in
the negotiation of mutual aid agreements between this and
other states.
(Source: P.A. 92-73, eff. 1-1-02.)

(20 ILCS 3305/14) (from Ch. 127, par. 1064)
    Sec. 14. Communications. The Illinois Emergency Management
Agency shall ascertain what means exist for rapid and
efficient communications in times of disaster. The Illinois
Emergency Management Agency shall consider the desirability of
supplementing these communications resources or of integrating
them into a comprehensive State or State-Federal
telecommunications or other communications system or network.
In studying the character and feasibility of any system or its
several parts, the Illinois Emergency Management Agency shall
evaluate the possibility of multipurpose use thereof for
general State and political subdivision purposes. The Illinois
Emergency Management Agency may promulgate rules to establish
policies and procedures relating to telecommunications and the
continuation of rapid and efficient communications in times of
disaster to the extent authorized by any provision of this Act
or other laws and regulations. The Illinois Emergency
Management Agency shall make recommendations to the Governor
as appropriate.
(Source: P.A. 86-755; 87-168.)


    (20 ILCS 3305/15) (from Ch. 127, par. 1065)
    Sec. 15. Immunity. Neither the State, any political
subdivision of the State, nor, except in cases of gross
negligence or willful misconduct, the Governor, the Director,
the Principal Executive Officer of a political subdivision, or
the agents, employees, or representatives of any of them,
engaged in any emergency management response or recovery
activities, while complying with or attempting to comply with
this Act or any rule or regulations promulgated pursuant to
this Act is liable for the death of or any injury to persons,
or damage to property, as a result of such activity. This
Section does not, however, apply to political subdivisions and
principal executive officers required to maintain emergency
services and disaster agencies that are not in compliance with
Section 10 of this Act, notwithstanding provisions of any
other laws. This Section does not, however, affect the right
of any person to receive benefits to which he or she would
otherwise be entitled under this Act under the Workers'
Compensation Act or the Workers' Occupational Diseases Act, or
under any pension law, and this Section does not affect the
right of any such person to receive any benefits or
compensation under any Act of Congress.
(Source: P.A. 92-73, eff. 1-1-02.)

(20 ILCS 3305/16) (from Ch. 127, par. 1066)
Sec. 16. Professions, Trades and Occupations. If such
disaster as is described in Section 4 occurs in this State and
the services of persons who are competent to practice any
profession, trade or occupation are required in this State to
cope with the disaster and it appears that the number of
persons licensed or registered in this State to practice such
profession, trade or occupation may be insufficient for such
purpose, then any persons who are licensed elsewhere to
practice any such profession, trade or occupation may, if a
member of a mobile support team or unit of another state
rendering aid in this State pursuant to the order of the
Governor of their home state and upon the request of the
Governor of this State, or if otherwise requested so to do by
the Governor or the Director of this State, during the time
the disaster continues, practice such profession, trade or
occupation in this State without being licensed or registered
in this State.
(Source: P.A. 85-1027.)


(20 ILCS 3305/17) (from Ch. 127, par. 1067)
Sec. 17. Authority to Accept Services, Gifts, Grants or
Loans. Whenever the federal government or any agency or
officer thereof or whenever any person, firm or corporation
shall offer to the State, or to any political subdivision
thereof, services, equipment, supplies, materials, or funds by
way of gift or grant, for purposes of emergency management,
the State, acting through the Governor, or such political
subdivision, acting through the principal executive officer,
may accept such offer and upon such acceptance the Governor of
the State, or the principal executive officer of such
political subdivision, may authorize an officer of the State
or of the political subdivision, as the case may be, to
receive such services, equipment, supplies, materials, or
funds on behalf of the State or such political subdivision.
(Source: P.A. 85-1027.)


(20 ILCS 3305/17.5)
Sec. 17.5. Homeland Security Emergency Preparedness
Fund. The Homeland Security Emergency Preparedness Trust Fund
is created as a federal trust fund in the State treasury. The
Trust Fund shall be held separate and apart from all public
moneys or funds of this State. All Homeland Security moneys
received by the Agency under Section 17 from a federal
department or agency shall be deposited into the Trust Fund.
Interest earned by the investment or deposit of moneys
accumulated in the Trust Fund shall be deposited into the
Trust Fund. The Agency is authorized to expend any moneys in
the Trust Fund for the specific purposes established by the

terms and conditions of the federal awards received by the
Agency and in any amount that the Agency deems necessary to
make grants and pay expenses in connection with its emergency
management and preparedness programs.
(Source: P.A. 99-36, eff. 7-14-15.)


    (20 ILCS 3305/18) (from Ch. 127, par. 1068)
    Sec. 18. Orders, Rules and Regulations.
    (a) The Governor shall file a copy of every rule,
regulation or order, and any amendment thereof made by the
Governor under the provisions of this Act in the office of the
Secretary of State. No rule, regulation or order, or any
amendment thereof shall be effective until 10 days after the
filing, provided, however, that upon the declaration of a
disaster by the Governor as is described in Section 7 the
provision relating to the effective date of any rule,
regulation, order or amendment issued under this Act and
during the state of disaster is abrogated, and the rule,
regulation, order or amendment shall become effective
immediately upon being filed with the Secretary of State
accompanied by a certificate stating the reason as required by
the Illinois Administrative Procedure Act.
    (b) Every emergency services and disaster agency
established pursuant to this Act and the coordinators thereof
shall execute and enforce the orders, rules and regulations as
may be made by the Governor under authority of this Act. Each
emergency services and disaster agency shall have available
for inspection at its office all orders, rules and regulations
made by the Governor, or under the Governor's authority. The
Illinois Emergency Management Agency shall furnish on the
Department's website the orders, rules and regulations to each
such emergency services and disaster agency. Upon the written
request of an emergency services or disaster agency, copies
thereof shall be mailed to the emergency services or disaster
agency.
(Source: P.A. 98-44, eff. 6-28-13.)


    (20 ILCS 3305/19) (from Ch. 127, par. 1069)
    Sec. 19. Utilization of Existing Agency, Facilities, and
Personnel. In carrying out the provisions of this Act the
Governor, the Director and the political subdivisions of the
State are directed to utilize the services, equipment,
supplies and facilities of existing departments, offices and
agencies of the State and of the political subdivisions of
this State, to the maximum extent practicable, and the
officers and personnel of all such departments, offices and
agencies are directed, upon request, to cooperate with and
extend such services and facilities to the Governor, the

Director and the emergency services and disaster agencies.
(Source: P.A. 85-1027.)


(20 ILCS 3305/20) (from Ch. 127, par. 1070)
    Sec. 20. Emergency Management Agency; personnel; oath.
Each person, whether compensated or noncompensated, who is
appointed to serve in any capacity in the Illinois Emergency
Management Agency or an emergency services and disaster
agency, shall, before entering upon his or her duties, take an
oath, in writing, before the Director or before the
coordinator of that emergency services and disaster agency or
before other persons authorized to administer oaths in this
State, which oath shall be filed with the Director or with the
coordinator of the emergency services and disaster agency with
which he or she shall serve and which oath shall be
substantially as follows:
    "I, _____, do solemnly swear (or affirm) that I
will support and defend and bear true faith and allegiance to
the Constitution of the United States and the Constitution of
the State of Illinois, and the territory, institutions and
facilities thereof, both public and private, against all
enemies, foreign and domestic; that I take this obligation
freely, without any mental reservation or purpose of evasion;
and that I will well and faithfully discharge the duties upon
which I am about to enter. And I do further swear (or affirm)
that I do not advocate, nor am I, nor have I been a member of
any political party or organization that advocates the
overthrow of the government of the United States or of this
State by force or violence; and that during such time as I am
affiliated with the (name of political subdivision), I will
not advocate nor become a member of any political party or
organization that advocates the overthrow of the government of
the United States or of this State by force or violence."
(Source: P.A. 92-73, eff. 1-1-02.)


    (20 ILCS 3305/21) (from Ch. 127, par. 1071)
    Sec. 21. No Private Liability.
    (a) Any person owning or controlling real estate or other
premises who voluntarily and without compensation grants a
license or privilege, or otherwise permits the designation or
use of the whole or any part or parts of such real estate or
premises for the purpose of sheltering persons during an
actual or impending disaster, or an exercise together with his
or her successors in interest, if any, shall not be civilly
liable for negligently causing the death of, or injury to, any
person on or about such real estate or premises under such
license, privilege or other permission, or for negligently
causing loss of, or damage to, the property of such person.
    (b) Any private person, firm or corporation and employees

and agents of such person, firm or corporation in the
performance of a contract with, and under the direction of,
the State, or any political subdivision of the State under the
provisions of this Act shall not be civilly liable for causing
the death of, or injury to, any person or damage to any
property except in the event of willful misconduct.

   (c) Any private person, firm or corporation, and any
employee or agent of such person, firm or corporation, who
renders assistance or advice at the request of the State, or
any political subdivision of the State under this Act during
an actual or impending disaster, shall not be civilly liable
for causing the death of, or injury to, any person or damage
to any property except in the event of willful misconduct.

   The immunities provided in this subsection (c) shall not
apply to any private person, firm or corporation, or to any
employee or agent of such person, firm or corporation whose
act or omission caused in whole or in part such actual or
impending disaster and who would otherwise be liable therefor.
(Source: P.A. 98-756, eff. 7-16-14.)

   (20 ILCS 3305/22) (from Ch. 127, par. 1072)
   Sec. 22. Political activities prohibited. No emergency
services and disaster agency established under the authority
of this Act shall be employed directly or indirectly by any
person or persons for political purposes.
(Source: P.A. 85-1027.)

> ⊕ View up to date information on how Illinois is handling the Coronavirus Disease 2019 (COVID-19) from the State of Illinois Coronavirus Response Site (https://coronavirus.illinois.gov/)   ✕

Illinois.gov (/)

**≺ SHARE**

# Executive Order 2020-32

April 30, 2020
Executive Order 2020-32

GOVERNMENT (/GOVERNMENT)

Executive Branch (/government/executive-branch)

Executive Orders (/government/executive-orders)

Judicial Branch (/government/judicial-branch)

Legislative Branch (/government/legislative-branch)

Resources & Records (/government/resources-records)

Transparency & Accountability (/government/transparency-accountability)

BUSINESS (/BUSINESS)

Consumers (/business/consumers)

Manage your Business (/business/manage-your-business)

Manage your Employees (/business/manage-your-employees)

Registration, Licenses, & Permits (/business/registration-licenses-permits)

EMPLOYMENT (/EMPLOYMENT)

Employee Rights (/employment/employee-rights)

Find Jobs (/employment/find-jobs)

Professional Licenses (/employment/professional-

<u>**EXECUTIVE ORDER 2020-32**</u>
<u>**(COVID-19 EXECUTIVE ORDER NO. 30)**</u>

**WHEREAS**, protecting the health and safety of Illinoisans is among the most important functions of State government; and,

**WHEREAS**, it is critical that Illinoisans who become sick are able to be treated by medical professionals, including when a hospital bed, emergency room bed, or ventilator is needed; and,

**WHEREAS**, it is also critical that the State's health care and first responder workforce has adequate personal protective equipment (PPE) to safely treat patients, respond to public health disasters, and prevent the spread of communicable diseases; and,

**WHEREAS**, Coronavirus Disease 2019 (COVID-19) is a novel severe acute respiratory illness that has spread among people through respiratory transmissions, the World Health Organization declared COVID-19 a Public Health Emergency of International Concern on January 30, 2020, and the United States Secretary of Health and Human Services declared that COVID-19 presents a public health emergency on January 27, 2020; and,

**WHEREAS**, on March 11, 2020, the World Health Organization characterized the COVID-19 outbreak as a pandemic, and has reported more than 3 million confirmed cases of COVID-19 and 200,000 deaths attributable to COVID-19 globally as of April 30, 2020; and,

**WHEREAS**, a vaccine or treatment is not currently available for COVID-19 and, on April 24, 2020, the World Health Organization warned that there is currently no evidence that people who have recovered from COVID-19 and have antibodies are protected from a second infection; and,

**WHEREAS**, despite efforts to contain COVID-19, the World Health Organization and the federal Centers for Disease Control and Prevention (CDC) indicated that the virus was expected to continue spreading and it has, in fact, continued to spread rapidly, resulting in the need for federal and State governments to take significant steps; and,

**WHEREAS**, the CDC currently recommends that all United States residents take precautions to contain the spread of COVID-19, including that they: (1) stay home as much as possible; (2) if they must leave their home, practice social distancing by maintaining 6 feet of distance from others and avoiding all gatherings; (3) wear cloth face coverings in public settings where other social distancing measures are difficult to maintain; (4) be alert for symptoms such as fever, cough, or shortness of breath, and take their temperature if symptoms develop; and (5) exercise appropriate hygiene, including proper hand-washing; and,

**WHEREAS**, the CDC also recommends the following precautions for household members, caretakers and other persons having close contact with a person with symptomatic COVID-19, during the period from 48 hours before onset of symptoms until the symptomatic person meets the criteria for discontinuing home isolation:  (1) stay home until 14 days after last exposure and maintain social distance (at least 6 feet) from others at all times; (2) self-monitor for symptoms, including checking their temperature twice a day and watching for fever, cough, or shortness of breath; and (3) avoid contact with people at higher risk for severe illness (unless they live in the same home and had the same exposure); and,

**WHEREAS**, as circumstances surrounding COVID-19 rapidly evolve, there have been frequent changes in information and guidance from public health officials as a result of emerging evidence; and,

**WHEREAS**, as of April 30, 2020, there have been nearly 53,000 confirmed cases of COVID-19 in 97 Illinois counties and 2,350 deaths from COVID-19; and,



069

WHEREAS, studies suggest that for every confirmed case there are many more unknown cases, some of which are asymptomatic individuals, meaning that individuals can pass the virus to others without knowing; and,

WHEREAS, as the virus has progressed through Illinois, the crisis facing the State has developed and now requires an evolving response to ensure hospitals, health care professionals and first responders are able to meet the health care needs of all Illinoisans and in a manner consistent with CDC guidance that continues to be updated; and,

WHEREAS, Illinois is using a high percentage of hospital beds, ICU beds, and ventilators as a result of the number of COVID-19 patients that require hospitalization and, if cases were to surge higher, the State would face a shortage of these critical health care resources; and,

WHEREAS, Illinois currently has a total of 32,010 hospital beds with 3,631 ICU beds, of which, as of April 30, 2020, only 33% of hospital beds and 26% of ICU beds were available statewide, and only 17% of ICU beds were available in the Chicago region; and,

WHEREAS, the State worked with top researchers from the University of Illinois at Urbana-Champaign, the Northwestern School of Medicine, the University of Chicago, the Chicago and Illinois Departments of Public Health, along with McKinsey and Mier Consulting Group, and Civis Analytics, to analyze two months' worth of daily data on COVID-19 deaths and ICU usage and model potential outcomes; and,

WHEREAS, the State's modeling shows that its health care resource utilization will not peak until May, and that health care resources will continue to be limited after the peak; and,

WHEREAS, the State's modeling shows that without extensive social distancing and other precautions, the State will not have sufficient hospital beds, ICU beds or ventilators; and,

WHEREAS, Illinois currently has a total of 32,010 hospital beds, and the State's modeling shows that without a "stay at home" order, more than 100,000 hospital beds would be necessary; and,

WHEREAS, Illinois currently has a total of 3,631 ICU beds, and the State's modeling shows that without a "stay at home" order, more than 25,000 ICU beds would be necessary; and,

WHEREAS, Illinois currently has a total of 3,378 ventilators, and the State's modeling shows that without a "stay at home" order, upwards of 20,000 ventilators would be necessary; and,

WHEREAS, the State's modeling shows that without a "stay at home" order, the number of deaths from COVID-19 would be between 10 to 20 times higher than with a "stay at home" order in place; and,

WHEREAS, I declared all counties in the State of Illinois as a disaster area on April 30, 2020 because the current circumstances in Illinois surrounding the spread of COVID-19 constitute an epidemic and a public health emergency under Section 4 of the Illinois Emergency Management Agency Act; and,

WHEREAS, I declared all counties in the State of Illinois as a disaster area on April 30, 2020 because the current circumstances surrounding the threatened shortages of hospital beds, ICU beds, ventilators, and PPE, and critical need for increased COVID-19 testing capacity constitute a public health emergency under Section 4 of the Illinois Emergency Management Agency Act; and,

WHEREAS, the Illinois Constitution, in Article V, Section 8, provides that "the Governor shall have the supreme executive power, and shall be responsible for the faithful execution of the laws," and states, in the Preamble, that a central purpose of the Illinois Constitution is "provide for the health, safety, and welfare of the people;" and,

WHEREAS, for the preservation of public health and safety throughout the entire State of Illinois, and to ensure that our healthcare delivery system is capable of serving those who are sick, I find it necessary to take measures consistent with public health guidance to slow and stop the spread of COVID-19 and to prevent shortages of hospital beds, ICU beds, ventilators, and PPE and to increase COVID-19 testing capacity;

THEREFORE, by the powers vested in me as the Governor of the State of Illinois, pursuant to the Illinois Constitution and Sections 7(1), 7(2), 7(3), 7(8), 7(9), and 7(12) of the Illinois Emergency Management Agency Act, 20 ILCS 3305, and consistent with the powers in public health laws, I hereby order the following, effective May 1, 2020:

Section 1. Public Health Requirements for Individuals Leaving Home and for Businesses

1. <u>Wearing a face covering in public places or when working</u>. Any individual who is over age two and able to medically tolerate a face-covering (a mask or cloth face-covering) shall be required to cover their nose and mouth with a face-covering when in a public place and unable to maintain a six-foot social distance. Face-coverings are

(/education/educators)

Learning Resources (/education/learning-resources)

Parents (/education/parents)

Students (/education/students)

RESIDENTS (/RESIDENTS)

Cars & Transportation (/residents/cars-transportation)

Citizen Resources (/residents/citizen-resources)

Family & Home (/residents/family-home)

Health & Safety (/residents/health-safety)

Neighborhoods/Housing (/residents/neighborhoods-housing)

Parent/Child Resources (/residents/parent-child-resources)

Senior Citizen Resources (/residents/senior-citizen-resources)

Veteran Resources (/residents/veteran-resources)

VISITING (/VISITING)

Arts and Culture (/visiting/arts-and-culture)

Family Attractions (/visiting/family-attractions)

Museums (/visiting/museums)

Outdoors (/visiting/outdoors)

Travel & Recreation (/visiting/travel-recreation)

ABOUT (/ABOUT)

History (/about/history)

State Information (/about/state-information)

EMAIL UPDATES (/PAGES/COMMUNICATIONSOPT

SEARCH (/SEARCH)

News (/search/news)

AGENCIES (/AGENCIES)

SERVICES (/SERVICES)

NEWS (/NEWS)

Release (/news/release)

required in public indoor spaces such as stores.

2. <u>Requirements for essential stores.</u> Retail stores (including, but not limited to, stores that sell groceries and medicine, hardware stores, and greenhouses, garden centers, and nurseries) designated as Essential Businesses and Operations under this Order shall to the greatest extent possible:
   - provide face coverings to all employees who are not able to maintain a minimum six-foot social distance at all times;
   - cap occupancy at 50 percent of store capacity, or, alternatively, at the occupancy limits based on store square footage set by the Department of Commerce and Economic Opportunity;
   - set up store aisles to be one-way where practicable to maximize spacing between customers and identify the one-way aisles with conspicuous signage and/or floor markings;
   - communicate with customers through in-store signage, and public service announcements and advertisements, about the social distancing requirements set forth in this Order (Social Distancing Requirements); and
   - discontinue use of reusable bags.

   Households must limit the number of members who enter stores to the minimum necessary.

3. <u>Requirements for non-essential stores.</u> Retail stores not designated as Essential Businesses and Operations may re-open for the limited purposes of fulfilling telephone and online orders through pick-up outside the store and delivery -- which are deemed to be Minimum Basic Operations. Employees working in the store must follow the social Distancing Requirements, and must wear a face covering when they may come within six feet of another employee or a customer.

4. <u>Requirements for manufacturers.</u> Manufacturers that continue to operate pursuant to this Order must follow Social Distancing Requirements and take appropriate precautions, which may include:
   - providing face coverings to all employees who are not able to maintain a minimum six-foot social distance at all times;
   - staggering shifts;
   - reducing line speeds;
   - operating only essential lines, while shutting down non-essential lines;
   - ensuring that all spaces where employees may gather, including locker rooms and lunchrooms, allow for social distancing; and
   - downsizing operations to the extent necessary to allow for social distancing and to provide a safe workplace in response to the COVID-19 emergency.

5. <u>Requirements for all businesses.</u> All businesses must evaluate which employees are able to work from home, and are encouraged to facilitate remote work from home when possible. All businesses that have employees physically reporting to a work-site must post the guidance from the Illinois Department of Public Health (IDPH) and Office of the Illinois Attorney General regarding workplace safety during the COVID-19 emergency. The guidance will be posted on the IDPH webpage.

Section 2. Stay at Home; Social Distancing Requirements; and Essential Businesses and Operations

1. <u>Stay at home or place of residence.</u> With exceptions as outlined below, all individuals currently living within the State of Illinois are ordered to stay at home or at their place of residence except as allowed in this Executive Order. To the extent individuals are using shared or outdoor spaces when outside their residence, they must at all times and as much as reasonably possible maintain social distancing of at least six feet from any other person, consistent with the Social Distancing Requirements set forth in this Executive Order. All persons may leave their homes or place of residence only for Essential Activities, Essential Governmental Functions, or to operate Essential Businesses and Operations, all as defined below.

   Individuals experiencing homelessness are exempt from this directive, but are strongly urged to obtain shelter, and governmental and other entities are strongly urged to make such shelter available as soon as possible and to the maximum extent practicable (and to use in their operation COVID-19 risk mitigation practices recommended by the U.S. Centers for Disease Control and Prevention (CDC) and the Illinois Department of Public Health (IDPH)). Individuals whose residences are unsafe or become unsafe, such as victims of domestic violence, are permitted and urged to leave their home and stay at a safe alternative location. For purposes of this Executive Order, homes or residences include hotels, motels, shared rental units, shelters, and similar facilities.

2. <u>Non-essential business and operations must cease.</u> All businesses and operations in the State, except Essential Businesses and Operations as defined below, are required to cease all activities within the State except Minimum Basic Operations, as defined below. For clarity, businesses may also continue operations consisting exclusively of employees or contractors performing activities at their own residences (i.e., working from home).

071

All Essential Businesses and Operations may remain open consistent with the express provisions of this Order and the intent of this Order as set forth in Section 2, Paragraph 16 below. To the greatest extent feasible, Essential Businesses and Operations shall comply with Social Distancing Requirements as defined in this Executive Order, including by maintaining six-foot social distancing for both employees and members of the public at all times, including, but not limited to, when any customers are standing in line.

3. **Prohibited activities.** All public and private gatherings of any number of people occurring outside a single household or living unit are prohibited, except for the limited purposes permitted by this Executive Order. Pursuant to current guidance from the CDC, any gathering of more than ten people is prohibited unless exempted by this Executive Order. Nothing in this Executive Order prohibits the gathering of members of a household or residence.

   All places of public amusement, whether indoors or outdoors, including but not limited to, locations with amusement rides, carnivals, amusement parks, water parks, aquariums, zoos, museums, arcades, fairs, children's play centers, playgrounds, funplexes, theme parks, bowling alleys, movie and other theaters, concert and music halls, and country clubs or social clubs shall be closed to the public.

4. **Prohibited and permitted travel.** All travel, including, but not limited to, travel by automobile, motorcycle, scooter, bicycle, train, plane, or public transit, except Essential Travel and Essential Activities as defined herein, is prohibited. People riding on public transit must comply with Social Distancing Requirements to the greatest extent feasible. This Executive Order allows travel into or out of the State to maintain Essential Businesses and Operations and Minimum Basic Operations.

5. **Leaving the home for essential activities is permitted.** For purposes of this Executive Order, individuals may leave their residence only to perform any of the following Essential Activities, and must follow the Social Distancing Requirements set forth in this Order, including wearing face coverings when in public or at work:

   i. **For health and safety.** To engage in activities or perform tasks essential to their health and safety, or to the health and safety of their family or household members (including, but not limited to, pets), such as, by way of example only and without limitation, seeking emergency services, obtaining medical supplies or medication, or visiting a health care professional.

   ii. **For necessary supplies and services.** To obtain necessary services or supplies for themselves and their family or household members, or to deliver those services or supplies to others, such as, by way of example only and without limitation, groceries and food, household consumer products, supplies they need to work from home, and products necessary to maintain the safety, sanitation, and essential operation of residences.

   iii. **For outdoor activity.** To engage in outdoor activity, provided the individuals comply with Social Distancing Requirements, as defined below, such as, by way of example and without limitation, walking, hiking, running, and biking. Individuals may go to public parks and open outdoor recreation areas, including specific State parks that remain open for certain activities, as designated by the Illinois Department of Natural Resources. Fishing, boating, and golf are permitted only when following the guidelines provided by the Illinois Department of Commerce and Economic Opportunity (DCEO). Playgrounds may increase spread of COVID-19, and therefore shall be closed.

   iv. **For certain types of work.** To perform work providing essential products and services at Essential Businesses or Operations (which, as defined below, includes Healthcare and Public Health Operations, Human Services Operations, Essential Governmental Functions, and Essential Infrastructure) or to otherwise carry out activities specifically permitted in this Executive Order, including Minimum Basic Operations.

   v. **To take care of others.** To care for a family member, friend, or pet in another household, and to transport family members, friends, or pets as allowed by this Executive Order.

   vi. **To engage in the free exercise of religion.** To engage in the free exercise of religion, provided that such exercise must comply with Social Distancing Requirements and the limit on gatherings of more than ten people in keeping with CDC guidelines for the protection of public health. Religious organizations and houses of worship are encouraged to use online or drive-in services to protect the health and safety of their congregants.

6. **Elderly people and those who are vulnerable as a result of illness should take additional precautions.** People at high risk of severe illness from COVID-19, including elderly people and those who are sick, are urged to stay in their residence to the extent possible except as necessary to seek medical care. Nothing in this Executive Order prevents the Illinois Department of Public Health or local public health departments from issuing and enforcing isolation and quarantine orders pursuant to the Department of Public Health Act, 20 ILCS 2305.

072

7. <u>Healthcare and Public Health Operations</u>. For purposes of this Executive Order, individuals may leave their residence to work for or obtain services through Healthcare and Public Health Operations. Healthcare and Public Health Operations includes, but is not limited to: hospitals; clinics; dental offices; pharmacies; public health entities, including those that compile, model, analyze and communicate public health information; pharmaceutical, pharmacy, medical device and equipment, and biotechnology companies (including operations, research and development, manufacture, and supply chain); organizations collecting blood, platelets, plasma, and other necessary materials; licensed medical cannabis dispensaries and licensed cannabis cultivation centers; reproductive health care providers; eye care centers, including those that sell glasses and contact lenses; home healthcare services providers; mental health and substance use providers; other healthcare facilities and suppliers and providers of any related and/or ancillary healthcare services; and entities that transport and dispose of medical materials and remains.

Specifically included in Healthcare and Public Health Operations are manufacturers, technicians, logistics, and warehouse operators and distributors of medical equipment, personal protective equipment (PPE), medical gases, pharmaceuticals, blood and blood products, vaccines, testing materials, laboratory supplies, cleaning, sanitizing, disinfecting or sterilization supplies, and tissue and paper towel products.

Healthcare and Public Health Operations also includes veterinary care and all healthcare and grooming services provided to animals.

Healthcare and Public Health Operations shall be construed broadly to avoid any impacts to the delivery of healthcare, broadly defined. Healthcare and Public Health Operations does not include fitness and exercise gyms, spas, salons, barber shops, tattoo parlors, and similar facilities.

8. <u>Human Services Operations</u>. For purposes of this Executive Order, individuals may leave their residence to work for or obtain services at any Human Services Operations, including any provider funded by the Illinois Department of Human Services, Illinois Department of Children and Family Services, or Medicaid that is providing services to the public and including state-operated, institutional, or community-based settings providing human services to the public.

Human Services Operations includes, but is not limited to: long-term care facilities; all entities licensed pursuant to the Child Care Act, 225 ILCS 10, except for day care centers, day care homes, and group day care homes; day care centers licensed as specified in Section 2, Paragraph 12(s) of this Executive Order; day programs exempt from licensure under Title 89 of the Illinois Administrative Code, Sections 377.3(a)(1)-(a)(4), (b)(2), and (c); day programs exempt from licensure under Title 89 of the Illinois Administrative Code, Section 377.3(d) (subject to the conditions governing exempt day care homes set forth in Section 1, Paragraph 12(s) of this Executive Order); residential settings and shelters for adults, seniors, children, and/or people with developmental disabilities, intellectual disabilities, substance use disorders, and/or mental illness; transitional facilities; home-based settings to provide services to individuals with physical, intellectual, and/or developmental disabilities, seniors, adults, and children; field offices that provide and help to determine eligibility for basic needs including food, cash assistance, medical coverage, child care, vocational services, rehabilitation services; developmental centers; adoption agencies; businesses that provide food, shelter, and social services, and other necessities of life for economically disadvantaged individuals, individuals with physical, intellectual, and/or developmental disabilities, or otherwise needy individuals.

Human Services Operations shall be construed broadly to avoid any impacts to the delivery of human services, broadly defined.

9. <u>Essential Infrastructure</u>. For purposes of this Executive Order, individuals may leave their residence to provide any services or perform any work necessary to offer, provision, operate, maintain and repair Essential Infrastructure.

Essential Infrastructure includes, but is not limited to: food production, distribution, and sale; construction (including, but not limited to, construction required in response to this public health emergency, hospital construction, construction of long-term care facilities, public works construction, and housing construction); building management and maintenance; airport operations; operation and maintenance of utilities, including water, sewer, and gas; electrical (including power generation, distribution, and production of raw materials); distribution centers; oil and biofuel refining; roads, highways, railroads, and public transportation; ports; cybersecurity

operations; flood control; solid waste and recycling collection and removal; and internet, video, and telecommunications systems (including the provision of essential global, national, and local infrastructure for computing services, business infrastructure, communications, and web-based services).

Essential infrastructure shall be construed broadly to avoid any impacts to essential infrastructure, broadly defined.

10. **Essential Governmental Functions.**  For purposes of this Executive Order, all first responders, emergency management personnel, emergency dispatchers, court personnel, law enforcement and corrections personnel, hazardous materials responders, child protection and child welfare personnel, housing and shelter personnel, military, and other governmental employees working for or to support Essential Businesses and Operations are categorically exempt from this Executive Order.

Essential Government Functions means all services provided by the State or any municipal, township, county, subdivision or agency of government and needed to ensure the continuing operation of the government agencies or to provide for or support the health, safety and welfare of the public, and including contractors performing Essential Government Functions.  Each government body shall determine its Essential Governmental Functions and identify employees and/or contractors necessary to the performance of those functions.

This Executive Order does not apply to the United States government. Nothing in this Executive Order shall prohibit any individual from performing or accessing Essential Governmental Functions.

11. **Businesses covered by this Executive Order.**  For the purposes of this Executive Order, covered businesses include any for-profit, non-profit, or educational entities, regardless of the nature of the service, the function it performs, or its corporate or entity structure.

12. **Essential Businesses and Operations.**  For the purposes of this Executive Order, Essential Businesses and Operations means Healthcare and Public Health Operations, Human Services Operations, Essential Governmental Functions, and Essential Infrastructure, and the following:
    a. **Stores that sell groceries and medicine.**  Grocery stores, pharmacies, certified farmers' markets, farm and produce stands, supermarkets, convenience stores, and other establishments engaged in the retail sale of groceries, canned food, dry goods, frozen foods, fresh fruits and vegetables, pet supplies, fresh meats, fish, and poultry, alcoholic and non-alcoholic beverages, and any other household consumer products (such as cleaning and personal care products). This includes stores that sell groceries, medicine, including medication not requiring a medical prescription, and also that sell other non-grocery products, and products necessary to maintaining the safety, sanitation, and essential operation of residences and Essential Businesses and Operations;
    b. **Food, beverage, and cannabis production and agriculture.**  Food and beverage manufacturing, production, processing, and cultivation, including farming, livestock, fishing, baking, and other production agriculture, including cultivation, marketing, production, and distribution of animals and goods for consumption; licensed medical and adult use cannabis dispensaries and licensed cannabis cultivation centers; and businesses that provide food, shelter, and other necessities of life for animals, including animal shelters, rescues, shelters, kennels, and adoption facilities;
    c. **Organizations that provide charitable and social services.**  Businesses and religious and secular nonprofit organizations, including food banks, when providing food, shelter, and social services, and other necessities of life for economically disadvantaged or otherwise needy individuals, individuals who need assistance as a result of this emergency, and people with disabilities;
    d. **Media.**  Newspapers, television, radio, and other media services;
    e. **Gas stations and businesses needed for transportation.**  Gas stations and auto-supply, auto-repair, and related facilities and bicycle shops and related facilities;
    f. **Financial institutions.**  Banks, currency exchanges, consumer lenders, including but not limited, to payday lenders, pawnbrokers, consumer installment lenders and sales finance lenders, credit unions, appraisers, title companies, financial markets, trading and futures exchanges, affiliates of financial institutions, entities that issue bonds, related financial institutions, and institutions selling financial products;
    g. **Hardware and supply stores and greenhouses, garden centers, and nurseries.**  Hardware stores and businesses that sell electrical, plumbing, and heating material, and greenhouses, garden centers, and nurseries;
    h. **Critical trades.**  Building and Construction Tradesmen and Tradeswomen, and other trades including but not limited to plumbers, electricians, exterminators, cleaning and janitorial staff for commercial and governmental properties, security staff, operating engineers, HVAC, painting, moving and relocation services, and other service providers who provide services that are necessary to maintaining the safety, sanitation, and essential operation of residences, Essential Activities, and Essential Businesses and

074

Operations;

i. **Mail, post, shipping, logistics, delivery, and pick-up services.** Post offices and other businesses that provide shipping and delivery services, and businesses that ship or deliver groceries, food, alcoholic and non-alcoholic beverages, goods or services to end users or through commercial channels;

j. **Educational institutions.** Educational institutions—including public and private pre-K-12 schools, colleges, and universities—for purposes of facilitating distance learning, performing critical research, or performing essential functions, provided that social distancing of six-feet per person is maintained to the greatest extent possible. Educational institutions may allow and establish procedures for pick-up of necessary supplies and/or student belongings and dormitory move-out if conducted in a manner consistent with public health guidelines, including Social Distancing Requirements. This Executive Order is consistent with and does not amend or supersede Executive Order 2020-05 (COVID-19 Executive Order No. 3) or Executive Order 2020-06 (COVID-19 Executive Order No. 4) except that affected schools have been closed past the April 7, 2020 date reflected in those Orders;

k. **Laundry services.** Laundromats, dry cleaners, industrial laundry services, and laundry service providers;

l. **Restaurants for consumption off-premises.** Restaurants and other facilities that prepare and serve food, but only for consumption off-premises, through such means as in-house delivery, third-party delivery, drive-through, curbside pick-up, and carry-out. Schools and other entities that typically provide food services to students or members of the public may continue to do so under this Executive Order on the condition that the food is provided to students or members of the public on a pick-up and takeaway basis only. Schools and other entities that provide food services under this exemption shall not permit the food to be eaten at the site where it is provided, or at any other gathering site due to the virus's propensity to physically impact surfaces and personal property. This Executive Order is consistent with and does not amend or supersede Section 1 of Executive Order 2020-07 (COVID-19 Executive Order No. 5) except that Section 1 is ordered to be extended through April 7, 2020;

m. **Supplies to work from home.** Businesses that sell, manufacture, or supply products needed for people to work from home;

n. **Supplies for Essential Businesses and Operations.** Businesses that sell, manufacture, or supply other Essential Businesses and Operations with the support or materials necessary to operate, including computers, audio and video electronics, household appliances; IT and telecommunication equipment; hardware, paint, flat glass; electrical, plumbing and heating material; sanitary equipment; personal hygiene products; food, food additives, ingredients and components; medical and orthopedic equipment; optics and photography equipment; diagnostics, food and beverages, chemicals, soaps and detergent; and firearm and ammunition suppliers and retailers for purposes of safety and security;

o. **Transportation.** Airlines, taxis, transportation network providers (such as Uber and Lyft), vehicle rental services, paratransit, and other private, public, and commercial transportation and logistics providers necessary for Essential Activities and other purposes expressly authorized in this Executive Order;

p. **Home-based care and services.** Home-based care for adults, seniors, children, and/or people with developmental disabilities, intellectual disabilities, substance use disorders, and/or mental illness, including caregivers such as nannies who may travel to the child's home to provide care, and other in-home services including meal delivery;

q. **Residential facilities and shelters.** Residential facilities and shelters for adults, seniors, children, and/or people with developmental disabilities, intellectual disabilities, substance use disorders, and/or mental illness;

r. **Professional services.** Professional services, such as legal services, accounting services, insurance services, real estate services (including appraisal and title services);

s. **Day care centers for employees exempted by this Executive Order.** Day care centers granted an emergency license pursuant to Title 89, Section 407.500 of the Illinois Administrative Code, governing Emergency Day Care Programs for children of employees exempted by this Executive Order to work as permitted. The licensing requirements for day care homes pursuant to Section 4 of the Child Care Act, 225 ILCS 10/4, are hereby suspended for family homes that receive up to 6 children for the duration of the Gubernatorial Disaster Proclamation;

t. **Manufacture, distribution, and supply chain for critical products and industries.** Manufacturing companies, distributors, and supply chain companies producing and supplying essential products and services in and for industries such as pharmaceutical, technology, biotechnology, healthcare, chemicals and sanitization, waste pickup and disposal, agriculture, food and beverage, transportation, energy, steel and steel products, petroleum and fuel, mining, construction, national defense, communications, as well as products used by other Essential Businesses and Operations;

u. **Critical labor union functions.** Labor Union essential activities including the administration of health and welfare funds and personnel checking on the well-being and safety of members providing services in Essential Businesses and Operations – provided that these checks should be done by telephone or remotely where possible;

v. **Hotels and motels.** Hotels and motels, to the extent used for lodging and delivery or carry-out food

075

services; and

w. Funeral services.  Funeral, mortuary, cremation, burial, cemetery, and related services.

13. Minimum Basic Operations.  For the purposes of this Executive Order, Minimum Basic Operations include the following, provided that employees comply with Social Distancing Requirements, to the extent possible, while carrying out such operations:
   1. The minimum necessary activities to maintain the value of the business's inventory, preserve the condition of the business's physical plant and equipment, ensure security, process payroll and employee benefits, or for related functions.
   2. The minimum necessary activities to facilitate employees of the business being able to continue to work remotely from their residences.
   3. For retail stores, fulfilling online and telephonic orders through pick-up outside the store or delivery.

14. Essential Travel.  For the purposes of this Executive Order, Essential Travel includes travel for any of the following purposes. Individuals engaged in any Essential Travel must comply with all Social Distancing Requirements as defined in this Section.
   1. Any travel related to the provision of or access to Essential Activities, Essential Governmental Functions, Essential Businesses and Operations, or Minimum Basic Operations.
   2. Travel to care for elderly, minors, dependents, persons with disabilities, or other vulnerable persons.
   3. Travel to or from educational institutions for purposes of receiving materials for distance learning, for receiving meals, and any other related services.
   4. Travel to return to a place of residence from outside the jurisdiction.
   5. Travel required by law enforcement or court order, including to transport children pursuant to a custody agreement.
   6. Travel required for non-residents to return to their place of residence outside the State. Individuals are strongly encouraged to verify that their transportation out of the State remains available and functional prior to commencing such travel.

15. Social Distancing, Face Covering, and PPE Requirements.  For purposes of this Executive Order, Social Distancing Requirements includes maintaining at least six-foot social distancing from other individuals, washing hands with soap and water for at least twenty seconds as frequently as possible or using hand sanitizer, covering coughs or sneezes (into the sleeve or elbow, not hands), regularly cleaning high-touch surfaces, and not shaking hands.
   1. Required measures.  Essential Businesses and Operations and businesses engaged in Minimum Basic Operations must take proactive measures to ensure compliance with Social Distancing Requirements, including where possible:
      1. Designate six-foot distances.  Designating with signage, tape, or by other means six-foot spacing for employees and customers in line to maintain appropriate distance;
      2. Hand sanitizer and sanitizing products.  Having hand sanitizer and sanitizing products readily available for employees and customers;
      3. Separate operating hours for vulnerable populations.  Implementing separate operating hours for elderly and vulnerable customers; and
      4. Online and remote access.  Posting online whether a facility is open and how best to reach the facility and continue services by phone or remotely.
      5. Face Coverings and PPE. ·Providing employees with appropriate face coverings and requiring that employees wear face coverings where maintaining a six-foot social distance is not possible at all times.  When the work circumstances require, providing employees with other PPE in addition to face coverings.

16. Intent of this Executive Order.  The intent of this Executive Order is to ensure that the maximum number of people self-isolate in their places of residence to the maximum extent feasible, while enabling essential services to continue, to slow the spread of COVID-19 to the greatest extent possible. When people need to leave their places of residence, whether to perform Essential Activities, or to otherwise facilitate authorized activities necessary for continuity of social and commercial life, they should at all times and as much as reasonably possible comply with Social Distancing Requirements. All provisions of this Executive Order should be interpreted to effectuate this intent. Businesses not specifically addressed by this Executive Order generally should cease activities and reduce to Minimum Basic Operations.

17. Enforcement.  This Executive Order may be enforced by State and local law enforcement pursuant to, *inter alia*, Section 7, Section 15, Section 18, and Section 19 of the Illinois Emergency Management Agency Act, 20 ILCS 3305.

18. Businesses must follow guidance provided or published by: the Office of the Governor, the Illinois Department of Commerce and Economic Opportunity, and State and local law enforcement regarding whether they qualify as

076

Essential; and the Illinois Department of Public Health, local public health departments, and the Workplace Rights Bureau of the Office of the Illinois Attorney General with respect to Social Distancing Requirements. Pursuant to Section 25(b) of the Whistleblower Act, 740 ILCS 174, businesses are prohibited from retaliating against an employee for disclosing information where the employee has reasonable cause to believe that the information discloses a violation of this Order.

19. <u>No limitation on authority</u>. Nothing in this Executive Order shall, in any way, alter or modify any existing legal authority allowing the State or any county, or local government body from ordering (1) any quarantine or isolation that may require an individual to remain inside a particular residential property or medical facility for a limited period of time, including the duration of this public health emergency, or (2) any closure of a specific location for a limited period of time, including the duration of this public health emergency. Nothing in this Executive Order shall, in any way, alter or modify any existing legal authority allowing a county or local government body to enact provisions that are stricter than those in this Executive Order.

**Section 3. Savings clause.**

If any provision of this Executive Order or its application to any person or circumstance is held invalid by any court of competent jurisdiction, this invalidity does not affect any other provision or application of this Executive Order, which can be given effect without the invalid provision or application. To achieve this purpose, the provisions of this Executive Order are declared to be severable. This Executive Order is meant to be read consistently with any Court order regarding this Executive Order.

_____

**JB Pritzker, Governor**

Issued by the Governor April 30, 2020

Filed by the Secretary of State April 30, 2020

**Stay Informed**

Emergencies & Disasters (https://www.illinois.gov/ready)

Flag Honors (/Pages/News/flag-honors.aspx)

Road Conditions (http://www.gettingaroundillinois.com/)

Traffic Alerts (http://www.iltrafficalert.com/)

Get Email Updates (https://www.illinois.gov/gov/Pages/CommunicationsOptIn.aspx)

**Helpful Links**

Illinois Privacy Info (/Pages/About/Privacy.aspx)

Kids Privacy (/Pages/About/Kids-Privacy.aspx)

Contact Us (/Pages/About/ContactUs.aspx)

FOIA Contacts (/Pages/FOIA-Contacts.aspx)

State Press Contacts (https://www.illinois.gov/cms/agency/media/relations/Pages/MediaContacts.aspx)

**Stay Connected**

(http://twitter.com/GovPritzker)

(https://www.facebook.com/GovPritzker)

(http://instagram.com/GovPritzker)

| Select Language |

Powered by Google Translate (https://translate.google.com)

(/)

Web Accessibility (http://www.dhs.state.il.us/page.aspx?item=32765)

Missing & Exploited Children (http://www.missingkids.com/)   Amber Alerts (http://www.amberillinois.org/)

Illinois Privacy Info (/Pages/About/Privacy.aspx)

Governor JB Pritzker (/sites/gov)

© 2020 State of Illinois (/)

077

**EXECUTIVE BRANCH**
**(20 ILCS 2305/) Department of Public Health Act. (Part 1)**

    (20 ILCS 2305/1.1) (from Ch. 111 1/2, par. 21.1)
    Sec. 1.1. Short title. This Act may be cited as
the Department of Public Health Act.
(Source: P.A. 86-1324.)


    (20 ILCS 2305/2) (from Ch. 111 1/2, par. 22)
    Sec. 2. Powers.
    (a) The State Department of Public Health has general
supervision of the interests of the health and lives of the
people of the State. It has supreme authority in matters of
quarantine and isolation, and may declare and enforce
quarantine and isolation when none exists, and may modify or
relax quarantine and isolation when it has been established.
The Department may adopt, promulgate, repeal and amend rules
and regulations and make such sanitary investigations and
inspections as it may from time to time deem necessary for the
preservation and improvement of the public health, consistent
with law regulating the following:
        (1) Transportation of the remains of deceased persons.
        (2) Sanitary practices relating to drinking water
made accessible to the public for human consumption or for
lavatory or culinary purposes.
        (3) Sanitary practices relating to rest room
facilities made accessible to the public or to persons
handling food served to the public.
        (4) Sanitary practices relating to disposal of human
wastes in or from all buildings and places where people
live, work or assemble.
    The provisions of the Illinois Administrative Procedure
Act are hereby expressly adopted and shall apply to all
administrative rules and procedures of the Department of
Public Health under this Act, except that Section 5-35 of the
Illinois Administrative Procedure Act relating to procedures
for rule-making does not apply to the adoption of any rule
required by federal law in connection with which the
Department is precluded by law from exercising any discretion.
    All local boards of health, health authorities and
officers, police officers, sheriffs and all other officers and
employees of the state or any locality shall enforce the rules
and regulations so adopted and orders issued by the Department
pursuant to this Section.
    The Department of Public Health shall conduct a public
information campaign to inform Hispanic women of the high
incidence of breast cancer and the importance of mammograms
and where to obtain a mammogram. This requirement may be
satisfied by translation into Spanish and distribution of the
breast cancer summaries required by Section 2310-345 of the
Department of Public Health Powers and Duties Law (20 ILCS
2310/2310-345). The information provided by the Department of
Public Health shall include (i) a statement that mammography

EXHIBIT
4

the Department, by clear and convincing evidence, must prove that the public's health and welfare are significantly endangered by a person or group of persons that has, that is suspected of having, that has been exposed to, or that is reasonably believed to have been exposed to a dangerously contagious or infectious disease including non-compliant tuberculosis patients or by a place where there is a significant amount of activity likely to spread a dangerously contagious or infectious disease. The Department must also prove that all other reasonable means of correcting the problem have been exhausted and no less restrictive alternative exists. For purposes of this subsection, in determining whether no less restrictive alternative exists, the court shall consider evidence showing that, under the circumstances presented by the case in which an order is sought, quarantine or isolation is the measure provided for in a rule of the Department or in guidelines issued by the Centers for Disease Control and Prevention or the World Health Organization. Persons who are or are about to be ordered to be isolated or quarantined and owners of places that are or are about to be closed and made off limits to the public shall have the right to counsel. If a person or owner is indigent, the court shall appoint counsel for that person or owner. Persons who are ordered to be isolated or quarantined or who are owners of places that are ordered to be closed and made off limits to the public, shall be given a written notice of such order. The written notice shall additionally include the following: (1) notice of the right to counsel; (2) notice that if the person or owner is indigent, the court will appoint counsel for that person or owner; (3) notice of the reason for the order for isolation, quarantine, or closure; (4) notice of whether the order is an immediate order, and if so, the time frame for the Department to seek consent or to file a petition requesting a court order as set out in this subsection; and (5) notice of the anticipated duration of the isolation, quarantine, or closure.

(d) The Department may order physical examinations and tests and collect laboratory specimens as necessary for the diagnosis or treatment of individuals in order to prevent the probable spread of a dangerously contagious or infectious disease. Physical examinations, tests, or collection of laboratory specimens must not be such as are reasonably likely to lead to serious harm to the affected individual. To prevent the spread of a dangerously contagious or infectious disease, the Department may, pursuant to the provisions of subsection (c) of this Section, isolate or quarantine any person whose refusal of physical examination or testing or collection of laboratory specimens results in uncertainty regarding whether he or she has been exposed to or is infected with a dangerously contagious or infectious disease or otherwise poses a danger to the public's health. An individual may refuse to consent to a physical examination, test, or collection of laboratory specimens. An individual shall be given a written notice that shall include notice of the following: (i) that the individual may refuse to consent to physical examination, test, or collection of laboratory specimens; (ii) that if the individual consents to physical

is the most accurate method for making an early detection of breast cancer, however, no diagnostic tool is 100% effective and (ii) instructions for performing breast self-examination and a statement that it is important to perform a breast self-examination monthly.

The Department of Public Health shall investigate the causes of dangerously contagious or infectious diseases, especially when existing in epidemic form, and take means to restrict and suppress the same, and whenever such disease becomes, or threatens to become epidemic, in any locality and the local board of health or local authorities neglect or refuse to enforce efficient measures for its restriction or suppression or to act with sufficient promptness or efficiency, or whenever the local board of health or local authorities neglect or refuse to promptly enforce efficient measures for the restriction or suppression of dangerously contagious or infectious diseases, the Department of Public Health may enforce such measures as it deems necessary to protect the public health, and all necessary expenses so incurred shall be paid by the locality for which services are rendered.

(b) Subject to the provisions of subsection (c), the Department may order a person or group of persons to be quarantined or isolated or may order a place to be closed and made off limits to the public to prevent the probable spread of a dangerously contagious or infectious disease, including non-compliant tuberculosis patients, until such time as the condition can be corrected or the danger to the public health eliminated or reduced in such a manner that no substantial danger to the public's health any longer exists. Orders for isolation of a person or quarantine of a place to prevent the probable spread of a sexually transmissible disease shall be governed by the provisions of Section 7 of the Illinois Sexually Transmissible Disease Control Act and not this Section.

(c) Except as provided in this Section, no person or a group of persons may be ordered to be quarantined or isolated and no place may be ordered to be closed and made off limits to the public except with the consent of the person or owner of the place or upon the prior order of a court of competent jurisdiction. The Department may, however, order a person or a group of persons to be quarantined or isolated or may order a place to be closed and made off limits to the public on an immediate basis without prior consent or court order if, in the reasonable judgment of the Department, immediate action is required to protect the public from a dangerously contagious or infectious disease. In the event of an immediate order issued without prior consent or court order, the Department shall, as soon as practical, within 48 hours after issuing the order, obtain the consent of the person or owner or file a petition requesting a court order authorizing the isolation or quarantine or closure. When exigent circumstances exist that cause the court system to be unavailable or that make it impossible to obtain consent or file a petition within 48 hours after issuance of an immediate order, the Department must obtain consent or file a petition requesting a court order as soon as reasonably possible. To obtain a court order,

examination, tests, or collection of laboratory specimens, the
results of that examination, test, or collection of laboratory
specimens may subject the individual to isolation or
quarantine pursuant to the provisions of subsection (c) of
this Section; (iii) that if the individual refuses to consent
to physical examination, tests, or collection of laboratory
specimens and that refusal results in uncertainty regarding
whether he or she has been exposed to or is infected with a
dangerously contagious or infectious disease or otherwise
poses a danger to the public's health, the individual may be
subject to isolation or quarantine pursuant to the provisions
of subsection (c) of this Section; and (iv) that if the
individual refuses to consent to physical examinations, tests,
or collection of laboratory specimens and becomes subject to
isolation and quarantine as provided in this subsection (d),
he or she shall have the right to counsel pursuant to the
provisions of subsection (c) of this Section. To the extent
feasible without endangering the public's health, the
Department shall respect and accommodate the religious beliefs
of individuals in implementing this subsection.

(e) The Department may order the administration of
vaccines, medications, or other treatments to persons as
necessary in order to prevent the probable spread of a
dangerously contagious or infectious disease. A vaccine,
medication, or other treatment to be administered must not be
such as is reasonably likely to lead to serious harm to the
affected individual. To prevent the spread of a dangerously
contagious or infectious disease, the Department may, pursuant
to the provisions of subsection (c) of this Section, isolate
or quarantine persons who are unable or unwilling to receive
vaccines, medications, or other treatments pursuant to this
Section. An individual may refuse to receive vaccines,
medications, or other treatments. An individual shall be given
a written notice that shall include notice of the following:
(i) that the individual may refuse to consent to vaccines,
medications, or other treatments; (ii) that if the individual
refuses to receive vaccines, medications, or other treatments,
the individual may be subject to isolation or quarantine
pursuant to the provisions of subsection (c) of this Section;
and (iii) that if the individual refuses to receive vaccines,
medications, or other treatments and becomes subject to
isolation or quarantine as provided in this subsection (e), he
or she shall have the right to counsel pursuant to the
provisions of subsection (c) of this Section. To the extent
feasible without endangering the public's health, the
Department shall respect and accommodate the religious beliefs
of individuals in implementing this subsection.

(f) The Department may order observation and monitoring of
persons to prevent the probable spread of a dangerously
contagious or infectious disease. To prevent the spread of a
dangerously contagious or infectious disease, the Department
may, pursuant to the provisions of subsection (c) of this
Section, isolate or quarantine persons whose refusal to
undergo observation and monitoring results in uncertainty
regarding whether he or she has been exposed to or is infected
with a dangerously contagious or infectious disease or
otherwise poses a danger to the public's health. An individual

may refuse to undergo observation and monitoring. An individual shall be given written notice that shall include notice of the following: (i) that the individual may refuse to undergo observation and monitoring; (ii) that if the individual consents to observation and monitoring, the results of that observation and monitoring may subject the individual to isolation or quarantine pursuant to the provisions of subsection (c) of this Section; (iii) that if the individual refuses to undergo observation and monitoring and that refusal results in uncertainty regarding whether he or she has been exposed to or is infected with a dangerously contagious or infectious disease or otherwise poses a danger to the public's health, the individual may be subject to isolation or quarantine pursuant to the provisions of subsection (c) of this Section; and (iv) that if the individual refuses to undergo observation and monitoring and becomes subject to isolation or quarantine as provided in this subsection (f), he or she shall have the right to counsel pursuant to the provisions of subsection (c) of this Section.

(g) To prevent the spread of a dangerously contagious or infectious disease among humans, the Department may examine, test, disinfect, seize, or destroy animals or other related property believed to be sources of infection. An owner of such animal or other related property shall be given written notice regarding such examination, testing, disinfection, seizure, or destruction. When the Department determines that any animal or related property is infected with or has been exposed to a dangerously contagious or infectious disease, it may agree with the owner upon the value of the animal or of any related property that it may be found necessary to destroy, and in case such an agreement cannot be made, the animals or related property shall be appraised by 3 competent and disinterested appraisers, one to be selected by the Department, one by the claimant, and one by the 2 appraisers thus selected. The appraisers shall subscribe to an oath made in writing to fairly value the animals or related property in accordance with the requirements of this Act. The oath, together with the valuation fixed by the appraisers, shall be filed with the Department and preserved by it. Upon the appraisal being made, the owner or the Department shall immediately destroy the animals by "humane euthanasia" as that term is defined in Section 2.09 of the Humane Care for Animals Act. Dogs and cats, however, shall be euthanized pursuant to the provisions of the Humane Euthanasia in Animal Shelters Act. The owner or the Department shall additionally, dispose of the carcasses, and disinfect, change, or destroy the premises occupied by the animals, in accordance with rules prescribed by the Department governing such destruction and disinfection. Upon his or her failure so to do or to cooperate with the Department, the Department shall cause the animals or related property to be destroyed and disposed of in the same manner, and thereupon the owner shall forfeit all right to receive any compensation for the destruction of the animals or related property. All final administrative decisions of the Department hereunder shall be subject to judicial review pursuant to the provisions of the Administrative Review Law, and all amendments and modifications thereof, and the rules adopted pursuant thereto.

The term "administrative decision" is defined as in Section 3-101 of the Code of Civil Procedure.

(h) To prevent the spread of a dangerously contagious or infectious disease, the Department, local boards of health, and local public health authorities shall have emergency access to medical or health information or records or data upon the condition that the Department, local boards of health, and local public health authorities shall protect the privacy and confidentiality of any medical or health information or records or data obtained pursuant to this Section in accordance with federal and State law. Additionally, any such medical or health information or records or data shall be exempt from inspection and copying under the Freedom of Information Act. Other than a hearing for the purpose of this Act, any information, records, reports, statements, notes, memoranda, or other data in the possession of the Department, local boards of health, or local public health authorities shall not be admissible as evidence, nor discoverable in any action of any kind in any court or before any tribunal, board, agency, or person. The access to or disclosure of any of this information or data by the Department, a local board of health, or a local public authority shall not waive or have any effect upon its non-discoverability or non-admissibility. Any person, facility, institution, or agency that provides emergency access to health information and data under this subsection shall have immunity from any civil or criminal liability, or any other type of liability that might otherwise result by reason of these actions except in the event of willful and wanton misconduct. The privileged quality of communication between any professional person or any facility shall not constitute grounds for failure to provide emergency access. Nothing in this subsection shall prohibit the sharing of information as authorized in Section 2.1 of this Act. The disclosure of any of this information, records, reports, statements, notes, memoranda, or other data obtained in any activity under this Act, except that necessary for the purposes of this Act, is unlawful, and any person convicted of violating this provision is guilty of a Class A misdemeanor.

(i) (A) The Department, in order to prevent and control disease, injury, or disability among citizens of the State of Illinois, may develop and implement, in consultation with local public health authorities, a Statewide system for syndromic data collection through the access to interoperable networks, information exchanges, and databases. The Department may also develop a system for the reporting of comprehensive, integrated data to identify and address unusual occurrences of disease symptoms and other medical complexes affecting the public's health.

(B) The Department may enter into contracts or agreements with individuals, corporations, hospitals, universities, not-for-profit corporations, governmental entities, or other organizations, whereby those individuals or entities agree to provide assistance in the compilation of the syndromic data collection and reporting system.

(C) The Department shall not release any syndromic
data or information obtained pursuant to this subsection
to any individuals or entities for purposes other than the
protection of the public health. All access to data by the
Department, reports made to the Department, the identity
of or facts that would tend to lead to the identity of the
individual who is the subject of the report, and the
identity of or facts that would tend to lead to the
identity of the author of the report shall be strictly
confidential, are not subject to inspection or
dissemination, and shall be used only for public health
purposes by the Department, local public health
authorities, or the Centers for Disease Control and
Prevention. Entities or individuals submitting reports or
providing access to the Department shall not be held
liable for the release of information or confidential data
to the Department in accordance with this subsection.
     (D) Nothing in this subsection prohibits the sharing
of information as authorized in Section 2.1 of this Act.
     (j) This Section shall be considered supplemental to the
existing authority and powers of the Department and shall not
be construed to restrain or restrict the Department in
protecting the public health under any other provisions of the
law.
     (k) Any person who knowingly or maliciously disseminates
any false information or report concerning the existence of
any dangerously contagious or infectious disease in connection
with the Department's power of quarantine, isolation and
closure or refuses to comply with a quarantine, isolation or
closure order is guilty of a Class A misdemeanor.
     (l) The Department of Public Health may establish and
maintain a chemical and bacteriologic laboratory for the
examination of water and wastes, and for the diagnosis of
diphtheria, typhoid fever, tuberculosis, malarial fever and
such other diseases as it deems necessary for the protection
of the public health.
     As used in this Act, "locality" means any governmental
agency which exercises power pertaining to public health in an
area less than the State.
     The terms "sanitary investigations and inspections" and
"sanitary practices" as used in this Act shall not include or
apply to "Public Water Supplies" or "Sewage Works" as defined
in the Environmental Protection Act. The Department may adopt
rules that are reasonable and necessary to implement and
effectuate this amendatory Act of the 93rd General Assembly.
     (m) The public health measures set forth in subsections
(a) through (h) of this Section may be used by the Department
to respond to chemical, radiological, or nuclear agents or
events. The individual provisions of subsections (a) through
(h) of this Section apply to any order issued by the
Department under this Section. The provisions of subsection
(k) apply to chemical, radiological, or nuclear agents or
events. Prior to the Department issuing an order for public
health measures set forth in this Act for chemical,
radiological, or nuclear agents or events as authorized in
subsection (m), the Department and the Illinois Emergency
Management Agency shall consult in accordance with the

Illinois emergency response framework. When responding to
chemical, radiological, or nuclear agents or events, the
Department shall determine the health related risks and
appropriate public health response measures and provide
recommendations for response to the Illinois Emergency
Management Agency. Nothing in this Section shall supersede the
current National Incident Management System and the Illinois
Emergency Operation Plan or response plans and procedures
established pursuant to IEMA statutes.
(Source: P.A. 96-698, eff. 8-25-09.)


    (20 ILCS 2305/2.1)
    Sec. 2.1. Information sharing.
    (a) Whenever a State or local law enforcement authority
learns of a case of an illness, health condition, or unusual
disease or symptom cluster, reportable pursuant to rules
adopted by the Department or by a local board of health or
local public health authority, or a suspicious event that may
be the cause of or related to a public health emergency, as
that term is defined in Section 4 of the Illinois Emergency
Management Agency Act, it shall immediately notify the
Illinois Emergency Management Agency and the Department or
local board of health or local public health authority.
    (b) Whenever the Department or a local board of health or
local public health authority learns of a case of an illness,
health condition, or unusual disease or symptom cluster,
reportable pursuant to rules adopted by the Department or by a
local board of health or a local public health authority, or a
suspicious event that it reasonably believes has the potential
to be the cause of or related to a public health emergency, as
that term is defined in Section 4 of the Illinois Emergency
Management Agency Act, it shall immediately notify the
Illinois Emergency Management Agency, the appropriate State
and local law enforcement authorities, other appropriate State
agencies, and federal health and law enforcement authorities
and, after that notification, it shall provide law enforcement
authorities with such other information as law enforcement
authorities may request for the purpose of conducting a
criminal investigation or a criminal prosecution of or arising
out of that matter. No information containing the identity or
tending to reveal the identity of any person may be
redisclosed by law enforcement, except in a prosecution of
that person for the commission of a crime.
    (c) Sharing of information on reportable illnesses, health
conditions, unusual disease or symptom clusters, or suspicious
events between and among public health and law enforcement
authorities shall be restricted to the information necessary
for the treatment in response to, control of, investigation
of, and prevention of a public health emergency, as that term
is defined in Section 4 of the Illinois Emergency Management
Agency Act, or for criminal investigation or criminal
prosecution of or arising out of that matter.
    (d) The operation of the language of this Section is not

dependent upon a declaration of disaster by the Governor
pursuant to the Illinois Emergency Management Agency Act.
(Source: P.A. 99-78, eff. 7-20-15.)


    (20 ILCS 2305/3) (from Ch. 111 1/2, par. 22.01)
    Sec. 3. The General Assembly shall from time to time make
appropriations to the Department of Public Health for
distribution to multiple-county and consolidated health
departments. Such appropriations shall be distributed to
health departments for municipality contributions to the
Illinois Municipal Retirement Fund. Distribution shall be made
to those health departments, which have no other funds
available for payment of municipality contributions, and have
certified the amount needed to each county in the health
department and one or more of the counties is at a county tax
rate of 75¢ per $100 of equalized valuation for the year for
which the contributions are required. The amount distributed
shall be equal to the amount which the county or counties
would have been required to contribute to the health
department for municipality contributions of the health
department if their county tax rate was less than 75¢ per $100
equalized valuation.
(Source: P.A. 76-1511.)


    (20 ILCS 2305/4) (from Ch. 111 1/2, par. 22.02)
    Sec. 4. No otherwise qualified child with a disability
receiving special education and related services under Article
14 of The School Code shall solely by reason of his or her
disability be excluded from the participation in or be denied
the benefits of or be subjected to discrimination under any
program or activity provided by the Department.
(Source: P.A. 99-143, eff. 7-27-15.)


    (20 ILCS 2305/5) (from Ch. 111 1/2, par. 22.03)
    Sec. 5. The Department of Public Health shall implement,
administer and enforce the provisions of the "Asbestos
Abatement Act".
(Source: P.A. 83-1325.)


    (20 ILCS 2305/5.5)
    Sec. 5.5. Specialized training for dementia-related
diseases. The Department, in cooperation with the Department

on Aging or any other appropriate federal, State, or local
agency, shall develop specialized training and experience
criteria for persons who provide health or home care to
victims of Alzheimer's disease or other dementia-related
disorders, including but not limited to cognitive and motor
skill disorders, stroke and related complications,
Huntington's disease, Pick's disease, Parkinson dementia
complex, and senility. In addition, the Department shall study
the effectiveness of certifying, through the Department or an
appropriate private certifying body, persons who provide
health or home care to victims of Alzheimer's disease or other
dementia-related disorders according to the criteria developed
under this Section. The Department shall develop the criteria
and present its findings and recommendations to the Governor
and the General Assembly on or before March 1, 2001.
(Source: P.A. 91-744, eff. 1-1-01.)


    (20 ILCS 2305/6) (from Ch. 111 1/2, par. 22.04)
    Sec. 6. The Department of Public Health shall develop and
implement a State plan for control of acquired
immunodeficiency syndrome (AIDS) to guide the activities of
State and local health authorities and all other officers and
employees of the State or any locality responsible for the
enforcement of public health laws, rules and regulations in
the prevention of infectious disease. The Department shall
review the provisions of the AIDS control plan with the AIDS
Advisory Council prior to adoption and implementation thereof.
(Source: P.A. 85-677.)


    (20 ILCS 2305/7) (from Ch. 111 1/2, par. 22.05)
    Sec. 7. The Illinois Department of Public Health shall
adopt rules requiring that upon death of a person who had or
is suspected of having an infectious or communicable disease
that could be transmitted through contact with the person's
body or bodily fluids, the body shall be labeled "Infection
Hazard", or with an equivalent term to inform persons having
subsequent contact with the body, including any funeral
director or embalmer, to take suitable precautions. Such rules
shall require that the label shall be prominently displayed on
and affixed to the outer wrapping or covering of the body if
the body is wrapped or covered in any manner. Responsibility
for such labeling shall lie with the attending physician,
advanced practice registered nurse, or physician assistant who
certifies death, or if the death occurs in a health care
facility, with such staff member as may be designated by the
administrator of the facility. The Department may adopt rules
providing for the safe disposal of human remains. To the
extent feasible without endangering the public's health, the
Department shall respect and accommodate the religious beliefs

of individuals in implementing this Section.
(Source: P.A. 99-581, eff. 1-1-17; 100-513, eff. 1-1-18.)


(20 ILCS 2305/7.5)
Sec. 7.5. Sarcoidosis research. The Department shall provide grants for research of sarcoidosis from funds appropriated for that purpose.
(Source: P.A. 94-372, eff. 7-29-05.)


(20 ILCS 2305/8) (from Ch. 111 1/2, par. 22.06)
Sec. 8. From funds appropriated to it for this purpose, the Department of Public Health shall annually make grants to regional poison resource centers to provide fast, accurate information for poison prevention, detection, surveillance, and treatment. The Department of Public Health shall develop standards to delineate the responsibilities of poison resource centers receiving funds under this Section.
(Source: P.A. 86-1292.)


(20 ILCS 2305/8.1) (from Ch. 111 1/2, par. 24)
Sec. 8.1. Whoever violates or refuses to obey any rule or regulation of the Department of Public Health shall be deemed guilty of a Class A misdemeanor. The Director of Public Health shall institute prosecutions and proceedings for violation of the rules and regulations adopted by the Department of Public Health, provided that he may designate a local board of health or local health officer to institute prosecutions or proceedings for violation of those rules and regulations adopted by the Department. Each State's Attorney shall prosecute all persons in his county violating or refusing to obey the rules and regulations of the Department of Public Health. All fines or judgments collected or received shall be paid to the County Treasurer of the county in which prosecution is conducted.
(Source: P.A. 87-895; 87-984.)


(20 ILCS 2305/8.2)
Sec. 8.2. Osteoporosis Prevention and Education Program.
(a) The Department of Public Health, utilizing available federal funds, State funds appropriated for that purpose, or other available funding as provided for in this Section, shall establish, promote, and maintain an Osteoporosis Prevention

and Education Program to promote public awareness of the causes of osteoporosis, options for prevention, the value of early detection, and possible treatments (including the benefits and risks of those treatments). The Department may accept, for that purpose, any special grant of money, services, or property from the federal government or any of its agencies or from any foundation, organization, or medical school.

    (b) The program shall include the following:

    (1) Development of a public education and outreach campaign to promote osteoporosis prevention and education, including, but not limited to, the following subjects:

        (A) The cause and nature of the disease.

        (B) Risk factors.

        (C) The role of hysterectomy.

        (D) Prevention of osteoporosis, including nutrition, diet, and physical exercise.

        (E) Diagnostic procedures and appropriate indications for their use.

        (F) Hormone replacement, including benefits and risks.

        (G) Environmental safety and injury prevention.

        (H) Availability of osteoporosis diagnostic treatment services in the community.

    (2) Development of educational materials to be made available for consumers, particularly targeted to high-risk groups, through local health departments, local physicians, advanced practice registered nurses, or physician assistants, other providers (including, but not limited to, health maintenance organizations, hospitals, and clinics), and women's organizations.

    (3) Development of professional education programs for health care providers to assist them in understanding research findings and the subjects set forth in paragraph (1).

    (4) Development and maintenance of a list of current providers of specialized services for the prevention and treatment of osteoporosis. Dissemination of the list shall be accompanied by a description of diagnostic procedures, appropriate indications for their use, and a cautionary statement about the current status of osteoporosis research, prevention, and treatment. The statement shall also indicate that the Department does not license, certify, or in any other way approve osteoporosis programs or centers in this State.

    (c) The State Board of Health shall serve as an advisory board to the Department with specific respect to the prevention and education activities related to osteoporosis described in this Section. The State Board of Health shall assist the Department in implementing this Section.

(Source: P.A. 99-581, eff. 1-1-17; 100-513, eff. 1-1-18.)

(20 ILCS 2305/8.3)
   Sec. 8.3. (Repealed).
(Source: P.A. 90-82, eff. 7-10-97. Repealed by P.A. 99-933,
eff. 1-27-17.)


   (20 ILCS 2305/8.4)
   Sec. 8.4. Immunization Advisory Committee. The Director of
Public Health shall appoint an Immunization Advisory Committee
to advise the Director on immunization issues. The Director
shall take into consideration any comments or recommendations
made by the Advisory Committee. The Immunization Advisory
Committee shall be composed of the following members with
knowledge of immunization issues: a pediatrician, a physician
licensed to practice medicine in all its branches, a family
physician, an infectious disease specialist from a university
based center, 2 representatives of a local health department,
a registered nurse, a school nurse, a public health provider,
a public health officer or administrator, a representative of
a children's hospital, 2 representatives of immunization
advocacy organizations, a representative from the State Board
of Education, a person with expertise in bioterrorism issues,
and any other individuals or organization representatives
designated by the Director. The Director shall designate one
of the Advisory Committee members to serve as the Chairperson
of the Advisory Committee.
(Source: P.A. 92-561, eff. 6-24-02.)

Case No. _____,_____ Date _____.

# ORDER FOR CLOSURE OF FACILITY / PLACE

The _____ (name of health department) has determined, based upon the information contained below, that the facility or other place referred to in this order is, or may be, the source of, or contaminated with a dangerously contagious or infectious disease. As a result, it is required that this facility or other place remain closed until it is no longer poses a risk of contagion or infection to others.

## Section A: Type of Order

This order for closure is made upon (check all that apply):
- ☐ **Voluntary (Consented)** (see Section E)
- ☐ **Immediate** *(If this is an immediate order then the health department may order closure without consent or a court order if immediate action is required to protect the public from a dangerously contagious or infectious disease. The health department must as soon as practical (within 48 hours after issuing immediate order) obtain consent or request a court order except when court system is unavailable or it is impossible to do so.) 20 ILCS 2305/2(c)*

## Section B: Information

**Place Subject to Closure:**
Name of Place:_____
Address: (Street)_____(Apt./Rm.#)_____ (City)_____
(State/Country)_____ (Zip)_____ (Telephone)_____ (Fax)_____
(Cell/pager)_____ (Email)_____

**Owner of Place Subject to Closure:**
Name: (Last)_____ (First)_____ (M.I.)_____ Date of Birth: ___-___-_____

**Current Location of Owner:**
Address: (Street)_____(Apt./Rm.#)_____ (City)_____
(State/Country)_____ (Zip)_____ (Telephone)_____ (Fax)_____
(Cell/pager)_____ (Email)_____

**Emergency or Other Contact Information of Owner:**
Name: (Last)_____ (First)_____ Relationship:_____
Address: (Street)_____(Apt./Rm.#)_____ (City)_____
(State/Country)_____ (Zip)_____ (Telephone)_____ (Fax)_____
(Cell/pager)_____ (Email)_____

## Section C: Department of Public Health Findings

1. A reasonable belief exists that the place identified in this order is or is suspected of being contaminated with the following dangerously contagious or infectious disease: _____

2. Closure is ordered based upon the following findings:
   - ☐ Physical Examination  ☐ Medical Evaluation  ☐ Laboratory Testing  ☐ Environmental Testing
   - ☐ Environmental or Human Exposure  ☐ Other Information

*Describe the facts in support of closure:* _____

_____

_____

3. Duration of Closure: _____

**EXHIBIT**

**5**

Case No. _____ Date _____

## Section D: Terms of Closure

The place subject to this order is required to close and remain closed. No person is permitted access to the premises without prior approval from the local health department. Persons who are permitted access by the local health department must follow all instructions, policies and procedures determined by the local health department.

## Section E: Statement of Legal Rights and Duties

1. The _____ (name of health department) has ordered this place to be closed and made off limits to members of the community, and requires that you follow the instructions set forth in Section D above, because it is believed that this place has been contaminated with a dangerously contagious or infectious disease which must be controlled in order to protect others from becoming infected.

2. This closure order will remain in effect only as long as there is a danger of spreading the disease to others.

3. _____ (name of health department) requests that you sign the consent agreement contained in Section H of this order. If you do not consent, then the _____ (name of health department) will seek a court order to require that this place remain closed. If this is an immediate order for closure then the _____ (name of health department) is not required to obtain your consent or file a petition seeking a court order until after issuing the order. The health department must as soon as practical (within 48 hours after issuing immediate order) obtain consent or request a court order except when court system is unavailable or it is impossible to do so. 20 ILCS 2305/2(c)

4. You have the right to counsel. If you are indigent, the court will appoint counsel for you. 20 ILCS 2305/2(e).

## Section F: Signature of Authorizing Official

_____ (name of health department)

Address: (Street)_____ (Apt./Rm.#)____ (City)_____
(State/Country)_____ (Zip)_____ (Telephone)_____ (Fax)_____
(Business Phone)_____ (After-hours Phone)_____

_____                    _____
Signature                                  Date and Time

Title _____

## Section G: Enforcement

Any person who knowingly or maliciously disseminates any false information or report concerning the existence of any dangerously contagious or infectious disease in connection with the Department's power of quarantine, isolation and closure or refuses to comply with a quarantine, isolation or closure order is guilty of a Class A misdemeanor. (20 ILCS 2305/2(k).)

## Section H: Consent Agreement to Closure (Optional, if individual consents)

I, _____, voluntarily agree to allow the place to be closed as ordered by the _____ (name of health department). I understand that my compliance with this closure order is important to safeguarding the public's health and that if I violate its terms, I will put myself at risk, endanger the community's health, and risk spreading a communicable disease to others. I have received a copy of, and have read or had

Case No. _____ Date _____

explained to me, information on the disease _____, The terms and conditions of the closure order have been explained to me, I have had a chance to ask questions, and they were answered to my satisfaction.

I understand that I must comply with this closure order and that if I wish to withdraw my voluntary consent to this closure order I will notify _____ (name of health department) at (xxx) xxx-xxxx (during normal business hours) or (xxx) xxx-xxxx (after hours). If I withdraw my voluntary consent to this closure order, the _____ (name of health department) will seek a court order to require that the place remain closed. If this is an immediate order for closure then the _____ (name of health department) is not required to obtain my consent or file a petition seeking a court order until after issuing the order. The health department must as soon as practical (within 48 hours after issuing immediate order) obtain consent or request a court order except when court system is unavailable or it is impossible to do so.

I understand that if I violate this order that I may be guilty of committing a Class A misdemeanor as described in Section G of this order.

I understand that if I have any questions regarding this closure order I should contact _____ (name of health department) at (xxx) xxx-xxxx (during normal business hours) or (xxx) xxx-xxxx (after hours).

_____        _____
Signature                          /        Date and Time

**Section I: Legal Authority**

This order is issued pursuant to the legal authority contained in the Department of Public Health Act (20 ILCS 2305/2).

**Joint Committee on Administrative Rules**

# ADMINISTRATIVE CODE

TITLE 77: PUBLIC HEALTH
CHAPTER I: DEPARTMENT OF PUBLIC HEALTH
SUBCHAPTER k: COMMUNICABLE DISEASE CONTROL AND IMMUNIZATIONS
PART 690 CONTROL OF COMMUNICABLE DISEASES CODE
SECTION 690.1330 ORDER AND PROCEDURE FOR ISOLATION, QUARANTINE AND
CLOSURE

---

**Section 690.1330  Order and Procedure for Isolation, Quarantine and Closure**

a) *The Department or* certified local health department *may order a person or group of persons to be quarantined or isolated or may order a place to be closed and made off limits to the public on an immediate basis without prior consent or court order if, in the reasonable judgment of the Department* or certified local health department, *immediate action is required to protect the public from a dangerously contagious or infectious disease.* (Section 2(c) of the Act) The determination that immediate action is required shall be based on the following:

1) The Department or the certified local health department has reason to believe that a person or group of persons is, or is suspected to be, infected with, exposed to, or contaminated with a dangerously contagious or infectious disease that could spread to or contaminate others if remedial action is not taken; and

2) The Department or the certified local health department has reason to believe that the person or group of persons would pose a serious and imminent risk to the health and safety of others if not detained for isolation; and

3) The Department or the certified local health department has first made efforts, which shall be documented, to obtain voluntary compliance with requests for medical examination, testing, treatment, counseling, vaccination, decontamination of persons or animals, isolation, and inspection and closure of facilities, or has determined that seeking voluntary compliance would create a risk of serious harm.

b) *All police officers, sheriffs and all other officers and employees of the State or any locality shall enforce the rules and regulations so adopted and orders issued by the Department* or the certified local health department. (Section 2(a) of the Act) The



EXHIBIT
6

Department or certified local health department may request the assistance of police officers, sheriffs, and all other officers and employees of any political subdivision within the jurisdiction of the Department or certified local health department to immediately enforce an order given to effectuate the purposes of this Subpart.

c)   If the Department or certified local health department orders the immediate isolation or quarantine of a person or group of persons:

1)   The immediate isolation or quarantine order shall be for a period not to exceed the period of incubation and communicability, as determined by the Department or certified local health department, for the dangerously contagious or infectious disease.

2)   The Department or certified local health department shall issue a written isolation or quarantine order within 24 hours after the commencement of isolation or quarantine pursuant to a verbal order, which shall specify the following:

A)   The identity of all persons or groups subject to quarantine or isolation, if known;

B)   The premises subject to quarantine, isolation or closure;

C)   *Notice of the right to counsel;*

D)   *Notice that if the person or owner is indigent, the court will appoint counsel for that person or owner;*

E)   *Notice of the reason for the order for isolation, quarantine or closure,* including the suspected dangerously contagious or infectious disease, if known;

F)   *Notice of whether the order is an immediate order, and if so, the time frame for the Department* or certified local health department *to seek consent or to file a petition requesting a court order;*

G)   *Notice of the anticipated duration of the isolation, quarantine, or closure,* including the dates and times at which isolation, quarantine, or closure commences and ends (Section 2(c) of the Act);

H)   A statement of the measures taken by the Department or the certified local health department to seek voluntary compliance or the basis on which the Department or the certified local health department determined that seeking voluntary compliance would create a risk of serious harm;

I)   A statement regarding the medical basis on which isolation,

quarantine, or closure is justified, e.g., clinical manifestations; physical examination; laboratory tests, diagnostic tests or other medical tests; epidemiologic information; or other evidence of exposure or infection available to the Department or certified local health department at the time;

J)   A statement that such persons may refuse examination, medical monitoring, medical treatment, prophylaxis, or vaccination, but remain subject to isolation or quarantine; and

K)   A statement that, at any time while the isolation, quarantine or closure order is in effect, persons under isolation, quarantine, or closure may request a hearing to review the isolation, quarantine or closure order as set forth in Section 690.1345 of this Subpart.

d)   Verbal Orders.

1)   The Department or certified local health department may issue a verbal order of isolation, quarantine, or closure without prior notice to the person or group of persons if the delay in imposing a written order of isolation, quarantine, or closure would jeopardize the Department's or certified local health department's ability to prevent or limit:

A)   The transmission of a dangerously contagious or infectious disease that poses a threat to the public; or

B)   The transmission of an infectious agent or possibly infectious agent that poses a threat to the public health;

2)   A verbal order of isolation, quarantine, or closure issued under this Subpart:

A)   Is valid for 24 hours and shall be followed up with a written order;

B)   May be verbally communicated by a first responder to the person or group of persons subject to isolation, quarantine, or closure; and

C)   May be enforced by the first responder until a written order is issued.

e)   *In the event of an immediate order issued without prior consent or court order, the Department or certified local health department shall, as soon as practical, within 48 hours after issuing the order, obtain the consent of the person or owner or file a petition requesting a court order authorizing the isolation, quarantine or closure. When exigent circumstances exist that cause the court system to be unavailable or that make it impossible to obtain consent or file a petition within 48 hours after issuance of an immediate order, the Department or certified local health department must obtain consent or file a petition requesting a court order as soon as reasonably possible.* (Section 2(c) of the Act)

1)     The petition for a court order authorizing involuntary isolation or quarantine of a person or group of persons or the closure of premises shall specify the following:

     A)     The identity of all persons or groups subject to isolation or quarantine, if known;

     B)     The premises subject to isolation, quarantine or closure;

     C)     The reason for the order for isolation, quarantine or closure, including the suspected dangerously contagious or infectious disease if known;

     D)     The date and time at which isolation, quarantine or closure will commence;

     E)     The anticipated duration of isolation, quarantine, or closure based on the suspected dangerously contagious or infectious disease, if known;

     F)     The measures taken by the Department or the certified local health department to seek voluntary compliance or the basis on which the Department or the certified local health department determined that seeking voluntary compliance would create a risk of serious harm;

     G)     The medical basis on which isolation, quarantine or closure is justified, e.g., clinical manifestations; physical examination; laboratory tests, diagnostic tests or other medical tests; epidemiologic information; or other evidence of exposure or infection available to the Department or certified local health department at the time.

2)     The petition shall be accompanied by the declaration of the Department or the certified local health department attesting to the facts asserted in the petition, together with any further information that may be relevant and material to the court's consideration.

f)     Upon filing a petition requesting a court order authorizing the isolation, quarantine or closure, or a petition requesting continued isolation, quarantine, or closure, the Department or certified local health department shall serve a notice of the hearing upon the person or persons who are being quarantined or isolated or upon the owner of the property that is being closed at least 24 hours before the hearing. If it is impractical to provide individual notice to large groups who are isolated or quarantined, a copy of the notice shall be posted in a designated location. The notice shall contain the following information:

1)     The time, date and place of the hearing;

2) The grounds and underlying facts upon which continued isolation, quarantine or closure is sought;

3) The person's right to appear at the hearing; and

4) The person's right to counsel, including the right, if the person is indigent, to be represented by counsel designated by the court.

g) *To obtain a court order, the Department or certified local health department, by clear and convincing evidence, must prove that the public's health and welfare are significantly endangered by a person or group of persons that has, that is suspected of having, that has been exposed to, or that is reasonably believed to have been exposed to a dangerously contagious or infectious disease, including non-compliant tuberculosis patients or that the public's health and welfare have been significantly endangered by a place where there is a significant amount of activity likely to spread a dangerously contagious or infectious disease. The Department or certified local health department must also prove that all other reasonable means of correcting the problem have been exhausted and no less restrictive alternative exists. For purposes of this subsection, in determining whether no less restrictive alternative exists, the court shall consider evidence showing that, under the circumstances presented by the case in which an order is sought, quarantine or isolation is the measure provided for in a rule of the Department or in guidelines issued by the Centers for Disease Control and Prevention or the World Health Organization.* (Section 2(c) of the Act)

1) Isolation, quarantine, or closure authorized as a result of a court order shall be for a period not to exceed 30 days from the date of issuance of the court order.

2) The Department or certified local health department may petition the court to continue the isolation, quarantine, or closure beyond the initial 30 days.

3) The Department or the certified local health department may petition the court to provide interpreters.

4) Prior to the expiration of a court order for continued isolation, quarantine, or closure, the Department or certified local health department may petition the court to continue isolation, quarantine, or closure, provided that:

   A) The Department or certified local health department provides the court with a reasonable basis to require continued isolation, quarantine, or closure to prevent a serious and imminent threat to the health and safety of others.

   B) The request for a continued order shall be for a period not to exceed 30 days.

(Source:  Added at 32 Ill. Reg. 3777, effective March 3, 2008)